# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
----------------------------------------------------------x
```

AMIN AL BAKRI,                                )
    Detainee,                               )
    United States Air Base at                )
    Bagram, Afghanistan;                    )
                                        )
MUHAMMAD AL BAKRI,                            )
    as the Next Friend of Amin Al Bakri,    )
                                        )
        Petitioners/Plaintiffs,         )
                                        )
v.                                           )
                                        )
                                        )
GEORGE W. BUSH                               )
    as President of the United States       )
    The White House                         )
    1600 Pennsylvania Avenue NW             )
    Washington, DC 20500                    )
                                        )
ROBERT GATES                                 )
    as Secretary, United States             )
    Department of Defense                   )
    1000 Defense Pentagon                   )
    Washington, D.C. 20301-1000             )
                                        )
JOHN DOE 1,                                  )
    Custodian of Petitioner; and            )
                                        )
JOHN DOE 2,                                  )
    Custodian of Petitioner,                )
                                        )
        Respondents/Defendants.         )
                                        )
                                        )

```
----------------------------------------------------------x
```

**PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND**

## PETITION FOR WRIT OF HABEAS CORPUS
## AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      Since 2001, the United States government has held hundreds of men, women, and children at the American detention center in Bagram, Afghanistan. The United States has disappeared these prisoners from all over the world, tortured and exposed them to inhuman treatment, and detained them indefinitely without access to their families, communities and counsel. They are denied all rights and procedural due process. While much judicial attention has focused on Guantánamo Bay, Cuba, the Government has maintained under its complete control a similar space without law at Bagram.

2.      This is a petition for a writ of habeas corpus and a complaint for declaratory and injunctive relief brought by Amin Al Bakri, a Yemeni national who is in the custody of the United States Government and presently detained at Bagram. He acts on his own behalf and through his Next Friend, Muhammad Al Bakri, his father.

3.      The U.S. government abducted and disappeared Mr. Al Bakri from Thailand almost six years ago. He has been tortured, coercively interrogated, and held unlawfully and virtually incommunicado ever since. For the first period of his detention, Mr. Al Bakri was held by U.S. officials in complete secrecy at an unknown location, eventually to reemerge at Bagram. Mr. Al Bakri's family learned of his whereabouts only after six months, during which time they had no knowledge of his well being and feared the worst.

4.      Mr. Al Bakri—abducted thousands of miles from any battlefield—is a civilian who has never participated in or abetted hostilities of any kind against the United States or its allies. Nonetheless, throughout the course of his detention, the United States has summarily detained him without charge.

2

5.      The United States has denied Mr. Al Bakri all access to counsel and the ability to challenge the legality of his detention.

6.      Mr. Al Bakri petitions this Court for a writ of habeas corpus compelling his release or establishing a lawful basis for his detention.

## I.
## JURISDICTION

7.      The Bagram detention facility, located on the Bagram Air Base, is under the exclusive jurisdiction and control of the United States Government.  Respondents act under the authority of Defendants the President of the United States and the Secretary of Defense.  They are the custodians of Mr. Al Bakri and hold the keys to his release.

8.      This Court has both subject matter jurisdiction over Mr. Al Bakri's claims and personal jurisdiction over Defendant officials, custodians of Mr. Al Bakri, pursuant to 28 U.S.C. §§ 2241(a), (c)(1) and (c)(3) (2006).  This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1350 (2006); Articles I §9, cl. 2 and III §2 of, and the Fifth and Sixth Amendments to the United States Constitution.  This court has the power to issue all necessary writs pursuant to 28 U.S.C. § 1651 (2006).

9.      Two recent Supreme Court decisions affirm this Court's jurisdiction over Mr. Al Bakri's habeas corpus petition. The first, *Boumediene v. Bush,* 128 S. Ct. 2229, at 2237 (June 12, 2008), declared that the Military Commissions Act of 2006 [MCA], Pub. L. No. 109-366, § 7, 120 Stat. 2600 (2006), "operates as an unconstitutional suspension of the writ [of habeas corpus]" in violation of Art. I, §9, cl. 2 of the United States Constitution. *Id.* at 2262. Foreign nationals detained by the United States "have the constitutional privilege of habeas corpus. They are not barred from seeking the writ or invoking the Suspension Clause's protections because they have been designated as enemy combatants or because of their presence at Guantánamo."

3

*Id.* at 2234-5. The Supreme Court affirmed federal jurisdiction after finding the "uncontested fact" that the United States, "by virtue of its complete jurisdiction and control over the base, maintains *de facto* sovereignty" over the military base at Guantánamo Bay, Cuba. *Id.* at 2253. Mr. Al Bakri is detained at an American air base over which the United States likewise exercises complete jurisdiction and control, and he is entitled to seek the writ in this Court.

10.    Although *Munaf v. Geren*, 128 S. Ct. 2207 (Jun. 12, 2008), involved only American citizens, the Supreme Court unanimously held that individuals detained "overseas in the immediate physical custody of American soldiers who answer only to an American chain of command" were entitled to seek the writ of habeas corpus. *Id* at 2216. "We think these concessions the end of the jurisdictional inquiry. . . . The writ . . . shall be directed to the person having custody of the person detained." *Id.* at 2216-7 (internal citations omitted).

## II.
## VENUE

11.    Venue is proper in the United States District Court for the District of Columbia. Defendants President Bush and Secretary Gates reside in the district, a substantial part of the events or omissions giving rise to the claim occurred in the district, and Defendants President Bush and Secretary Gates are officers or employees of the United States or any agency thereof acting in their official capacity. 28 U.S.C. § 1391(b) & (e) (2006).

## III.
## PARTIES

12.    Petitioner Amin Al Bakri, a Yemeni national, is presently held in the unlawful custody of the United States Government at the American detention center in Bagram, Afghanistan.

13.    Petitioner Muhammad Al Bakri is Amin Al Bakri's father. Because Respondents are denying his son access to counsel and the ability to challenge his detention, Muhammad Al

4

Bakri is acting as his Next Friend.

14.     Respondent George W. Bush is President of the United States and Commander-in-Chief of the U.S. Armed Forces.  Accordingly, he is ultimately responsible for Mr. Al Bakri's unlawful detention.  President Bush is sued in his official capacity.

15.     Respondent Robert Gates is the Secretary of the United States Department of Defense.  He maintains the custody and control of Mr. Al Bakri, and is therefore Mr. Al Bakri's ultimate custodian.  Secretary Gates is sued in his official capacity.

16.     Respondents John Does are the commanding officers at Bagram Air Base and Mr. Al Bakri is in their immediate physical custody.  They are sued in their official capacity.

## IV.
## STATEMENT OF FACTS

17.     Mr. Amin Al Bakri is thirty-nine years old.  He is a Yemeni citizen.  He has been married since 1988 and is the father of three children, two sons aged 17 and 13, and a daughter aged 11, all of whom have been raised without their father for the last six years.

18.     Mr. Al Bakri was born in Medina, Saudi Arabia, and later settled in Yemen with his wife and three children, trading in precious stones and shrimp with a number of Southeast Asian countries.

19.     Mr. Al Bakri was disappeared by the United States on or around December 30, 2002 while on a short business trip to Bangkok, Thailand.  On the day he was abducted, he had checked out of his hotel and was on his way to the airport to fly back to his wife and children in Yemen.

20.     For six months his family and friends had no idea where he was and feared the worst.  The first news came when the Al-Sharq Al-Awsat newspaper reported Mr. Al-Bakri's disappearance and attributed it to American agents.

21.    Mr. Al Bakri's family attempted in vain to learn more of Mr. Al Bakri's fate. It was not until six months after his disappearance that they learned of his whereabouts and received confirmation that he was alive only after receiving a postcard in his handwriting sent from Bagram prison in Afghanistan via the International Committee of the Red Cross (ICRC). In that letter, Mr. Al Bakri asked his family to look after his children.

22.    Petitioner's family does not know with certainty where Mr. Al Bakri was detained between his abduction from Bangkok in December 2002, and his eventual reappearance in Bagram many months later. On information and belief, based on the circumstances and place of his disappearance, Mr. Al Bakri was held in secret prisons (so-called "black sites") run by the United States during this time—a practice documented and condemned in numerous official reports. *See, e.g.*, Dick Marty, Comm. on Legal Affairs and Human Rights, Council of Europe, *Alleged Secret Detentions and Unlawful Inter-state Transfers of Detainees Involving Council of Europe Member States* (Jun. 12, 2006) ¶¶ 24-26 (hereinafter, "Council of Europe Rep."), http://assembly.coe.int/Main.asp?Link=/CommitteeDoes/2006/20060606_Ejdoc162006PartII-FINAL.htm.

23.    Neither Muhammad Al Bakri nor the rest of his family have seen Amin Al Bakri for almost six years. They have no idea why he was disappeared, why he continues to be held, or when he will be released. They can only conjecture as to what he has endured and suffered from the knowledge that many prisoners now released from Bagram were tortured and interrogated by the U.S. Military while in secret CIA detention there.

24.    Mr. Al Bakri is not, nor has he ever been, an enemy alien, or a lawful or unlawful belligerent. Mr. Al Bakri is not, nor has he ever been, an enemy combatant who was fighting against the United States, coalition partners in Afghanistan, or any other United States ally.

6

25.    Mr. Al Bakri was not involved, directly or indirectly, in the attacks on the United States on September 11, 2001, the ensuing armed conflict, or any act of international terrorism attributed by the United States to Al Qaeda or any other terrorist organization. To the contrary, he was in Yemen on September 11, watching in shock with his father as the horror unfolded on television.

26.    Since abducting Mr. Al Bakri in Bangkok, respondents have held him virtually *incommunicado*, without access to counsel, and without any legal process whatsoever.

27.    In both CIA detention and at Bagram Prison, U.S. officers have repeatedly coercively interrogated and tortured Mr. Al Bakri.

28.    The United States has not charged Mr. Al Bakri nor notified him of any pending or contemplated charges.

29.    Neither respondents nor their agents have informed Mr. Al Bakri of his rights under the United States Constitution, the regulations of the United States Military, the Geneva Conventions, the Vienna Convention, the International Covenant on Civil and Political Rights, the American Declaration on the Rights and Duties of Man, or customary international law.

30.    As a result, Mr. Al Bakri is completely unable either to protect or to vindicate his rights under domestic and international law.

31.    Despite the harsh and unjust treatment he has received from his captors, Mr. Al Bakri has been an exemplary prisoner, patiently awaiting to be reunited with his family and children after almost six years of unlawful detention. He has improved his English, French, Urdu, and Farsi, to the point where he now frequently acts as an interpreter between U.S. military authorities and detainees, often defusing and mediating disputes between the two groups.

7

32.    Since receiving first word from Mr. Al Bakri, his family has received messages from him through the ICRC.  Those messages have not arrived regularly.  They are subject to length-restrictions and U.S. military censorship.

33.    Because the United States has denied Mr. Al Bakri's access to counsel and prevented his direct communication with the outside world, his father Muhammad Al Bakri has authorized counsel to take any appropriate legal action on behalf of his son to challenge his son's unlawful detention.

### The American Detention Facility in Bagram, Afghanistan

34.    Respondents are presently detaining Mr. Al Bakri at Bagram Air Base.

35.    The Bagram Air Base and detention facility are under the exclusive jurisdiction and control of the United States military.  Mr. Al Bakri is in the immediate physical custody of U.S. soldiers who answer only to the U.S. chain of command.

36.    The United States has operated the detention facility since 2002.  *See, e.g.*, Tim Golden & Eric Schmitt, *A Growing Afghan Prison Rivals Bleak Guantánamo*, N.Y. Times, Feb. 26, 2006, at 1.

37.    An official investigation into the flagrant abuse of detainees at Abu Ghraib in Iraq found that methods of extreme interrogation spread from detention facilities in Afghanistan, of which Bagram is one, to Abu Ghraib.  James R. Schlesinger, et al., *Final Report of the Independent Panel to Review DoD Detention Operations*, Aug. 24, 2004, at 8-9, *available at* http://www.pbs.org/wgbh/pages/frontline/torture/paper/reports.html ("Schlesinger Rep.); Major General George R. Fay, *AR 15-6 Investigation of the Abu Ghraib Detention Facility and 205th Military Intelligence Brigade*, Aug. 25, 2004, *available at* http://news.findlaw.com/hdocs/docs/dod/fay82504rpt.pdf ("Fay-Jones Rep.").  *See also* Bazelon,

*supra*, at 50 (noting that former head of interrogation unit at Bagram who was reassigned to Abu Ghraih implemented an interrogation policy that was "remarkably similar" to the one she had developed in Bagram).

38.    Currently more than 630 prisoners are held at Bagram. This is more than twice the number of prisoners in Guantánamo. Most of the prisoners are Afghan, but Bagram has also held prisoners captured as far away as Central Africa and Southeast Asia, including Mr. Al Bakri. *See* Tim Golden, *Defying U.S. Plan, Prison Expands in Afghanistan*, N. Y. Times, Jan. 7, 2008, at A1; Fisnik Abrashi, *US Lets Afghan Detainees, Families Talk*, Associated Press, Jan. 14, 2008.

39.    The State Department has described Bagram as a "temporary 'collection center' where some detainees stop over en route to their permanent location"—typically Guantánamo. *See* U.S. Dep't of State, *Information Memorandum re: Nationalities at Bagram* (2002), *available at* http://www.aclu.org/torturefoia/released/120704.html; Emily Bazelon, *From Bagram to Abu Ghraib*, Mother Jones, Mar. 1, 2005, at 50.

40.    Department of Defense officials have expressed concern that while the Bagram detention facility was not built to house prisoners for more than a brief period of time, "now it's a *long-term facility* without the money or resources." *See* Golden & Schmitt, *supra*, at 1 (emphasis supplied).

41.    Moreover, they have admitted that the "[Department of Defense] system for releasing detainees whose intelligence value turned out to be negligible did not keep pace with the numbers [they] were bringing in." *Id.*

42.    One Pentagon official has stated that, as of February 2006, the average stay of a detainee at Bagram is more than fourteen months. *Id.* However, some detainees have been held

without charge for as long as five years. *See* Fisnik Abrashi, *Red Cross: Change Needed at US Prison*, ASSOCIATED PRESS, April 14, 2008.

43.    Upon arrival, many detainees begin their stay at Bagram by being hooded, shackled and isolated for at least 24 hours, and sometimes as long as 72 hours. *See* Tim Golden, *Army Faltered in Investigating Detainee Abuse*, N.Y. TIMES, May 22, 2005, at 1.

44.    Like the detainees who were transferred to Guantánamo in its early days, the Bagram detainees are held in primitive wire-mesh cages. These cages are often packed with a dozen detainees and only a bucket to serve as a toilet. *See* Golden & Schmitt, *supra*. A former prisoner held for more than two years at Bagram described his cell as "a cage," like those used for animals at the Karachi Zoo in Pakistan. *Id.*

45.    One detainee has reported that bright lights shine around the clock, and those who try to shield their faces are punished by having to assume and maintain "stress positions." Eliza Griswold, *American Gulag: Prisoners' Tales from the War on Terror*, HARPER'S, Sept. 1, 2006, at 41.

46.    Loudspeakers are used to keep prisoners awake. *See* Campbell & Goldenberg, *supra*, at 15.

47.    In addition, detainees at Bagram are forbidden from looking at each other or talking, and face punishment for doing so. *Id.* (quoting former detainee who recalled "if we talked to each other, we were sent into a dark room and had our hands tied").

48.    Former Bagram detainees have consistently described abusive interrogation tactics amounting to torture and cruel, inhuman or degrading treatment at the hands of their captors.

49.    For example, Bagram detainees have reported being held in solitary confinement

10

for up to eleven months straight, as well as being starved, beaten, kicked, left out in the freezing cold, and sexually humiliated. Pennington, *supra*; Kristof, *supra*, at 21.

50.   At least two Bagram detainees have died while in custody. *See* Golden, *supra*, at 1. Documents leaked from an Army investigation into the deaths revealed that the deaths had been ruled a homicide, contradicting the military's earlier assertions that both had died of natural causes. *Id. See also* ACLU, *Autopsy Reports Reveal Homicides of Detainees in U.S. Custody*, Oct. 24, 2005, http://action.aclu.org/torturefoia/released/102405.   Both detainees had been chained to the ceiling for days at a time and brutally beaten. *See* Julian Borger, *Report Implicates Top Brass in Bagram Scandal*, GUARDIAN, May 21, 2005, at 4.

51.   In one case, the detainee was reportedly killed over a five-day period by "destroying his leg muscle tissue with repeated unlawful knee strikes" that according to the medical examiner were so severe that "even if he had survived, both legs would have to be amputated." Douglas Jehl, *Army Details Scale of Abuse in Afghan Jail*, N.Y. TIMES, Mar. 12, 2005, at 1.

52.   Another detainee who died while in custody at Bagram was similarly tortured, and died of a pulmonary embolism from being beaten while he was chained to the ceiling by his wrists. *Id.* Coroners said that his legs "had basically been pulpified" and looked as though they had been run over by a bus. Borger, *supra*, at 4.

53.   Reports indicate that these deaths were not isolated incidents, but part of a pattern of abuse at Bagram. The Army Criminal Investigation Command revealed that the prisoner abuse at Bagram went far beyond the two deaths, and described the abuse of another prisoner who had been tortured by "kicks to the groin and leg, shoving or slamming him into walls/tables, forcing the detainee to maintain painful, contorted body positions during interview and forcing

11

water into his mouth until he could not breathe." *See* Jehl, *supra*, at 1.

54.    Another detainee was abused by a military interrogator who had "placed his penis along the face" of the detainee, and later "simulated anally sodomizing him (over his clothes)." *Id.*

55.    Other Bagram detainees have also complained of acts of sexual brutality. *See* Suzanne Goldenberg & James Meek, *Papers Reveal Bagram Abuse: Prisoners subjected to 'mock executions'; Photographs of detainees being sexually humiliated*, GUARDIAN, Feb. 18, 2005, at 1 (reporting that soldiers "forcibly rammed a stick up [a detainee's] rectum").

56.    In addition, there have been reports of 'mock executions' at Bagram. *Id.* One detainee described being threatened with dogs, stripped, and photographed "in shameful and obscene positions," and placed in a cage with a hook and a hanging rope, from which he was hung blindfolded for two days. *Id.*

57.    While many former Bagram officers have denied knowledge of any serious mistreatment of detainees prior to the two homicides, reports indicate that many of the methods cited as a basis for the criminal charges, including chaining prisoners to the ceilings of isolation cells for long periods, were either standard practice at Bagram or well known to those who oversaw it. Tim Golden, *Abuse Cases Open Command Issues at Army Prison*, N.Y. TIMES, Aug. 8, 2005, at 1.

58.    One former guard said that he and other policemen were specifically instructed at Bagram how to deliver the type of blows that killed the two detainees, and that the strikes were commonly used when detainees were being hooded or shackled. *Id.*

59.    In addition, the results of the Army investigation following the deaths of the two detainees substantiated Human Rights Watch's own investigation showing that beatings and

stress positions were widely used. Jehl, *supra*, at 1 (quoting Human Rights Watch's finding that "far from a few isolated cases," abuse in Afghanistan was "the rule more than the exception").

60.    These interrogation techniques are "not approved by military doctrine or included in Army field manuals." Bazelon, *supra*, at 50. *See also* Fay-Jones Rep.; Schlesinger Rep., at App. D.

61.    Unlike the prisoners at Guantánamo, the prisoners at Bagram have been successfully kept "out of sight, out of mind." Golden & Schmitt, *supra*, at 1 (quoting a Defense Department official.)

62.    Their torture, and the cruel and inhuman treatment they experience is compounded by the lack of any fair process at Bagram. As Jacob Kellenberger, President of the ICRC, recently stated, prisoners at Bagram "don't know what the future brings, how long they will be there, and under what conditions they will be released." *See* Abrashi, *supra*, at 1.

### The U.S. Secret Detention, Torture and Extraordinary Rendition Program

63.    Respondents secretly detained and coercively interrogated Mr. Al Bakri in one or more "black sites," and tortured him there.

64.    Since September 2001, the Central Intelligence Agency (CIA) has operated a secret interrogation program that uses forced disappearance, secret detention at U.S.-run facilities around the world, torture and cruel, inhuman or degrading treatment (or what the CIA describes as "enhanced interrogation techniques"), as well as transfer of detainees to countries that are known to use torture. Jane Mayer, *The Black Sites: A Rare Look Inside the C.I.A.'s Secret Interrogation Program*, NEW YORKER, Aug. 13, 2007, at 46; Dana Priest, *Covert CIA Program Withstands New Furor—Anti-Terror Efforts Continue to Grow*, WASH. POST, Dec. 30, 2005, at A1.

65.    The program was authorized under a classified September 17, 2001 presidential finding. Mayer, *supra*; Priest, *supra*; Douglas Jehl & David Johnson, *CIA Now Acting Independently to Move Prisoners*, N.Y. TIMES, Mar. 7, 2005, at 4.

66.    The CIA program has been publicly acknowledged at the highest levels of American government, including by President Bush, CIA Director Michael Hayden, members of the United States House and Senate, and within court filings by the U.S. Department of Justice. White House, Office of the Press Secretary, *President Discusses Creation of Military Commissions to Try Suspected Terrorists* (Sept. 6, 2006), *available at* http://www.whitehouse.gov/news/releases/2006/09/20060906-3.html; Mayer, *supra*.

67.    Under this program, the CIA has exercised what administration officials argued is unfettered power to use interrogation techniques that violate domestic and international prohibitions against torture as well as cruel, inhuman and degrading treatment. Mayer, *supra*.

68.    In establishing the CIA program, the United States negotiated agreements with foreign governments to set up U.S.-run detention facilities ("black sites"). John Barry, Michael Hirsch, Michal Isikoff, *The Roots of Torture*, NEWSWEEK, May 24, 2005, at 26.

69.    These black sites are believed to have been located at various times in eight countries, including possibly Thailand, Romania, Poland, Afghanistan, and Guantánamo Bay, Cuba. Human Rights Watch, *Statement on U.S. Secret Detention Facilities in Europe*, Jun. 7, 2006, http://hrw.org/english/docs/2005/11/07/usint11995.htm.

70.    The Council of Europe has described the system of "targeting, apprehending and detaining terrorist suspects" as a "global spider's web" of which the United States is the "chief architect." Council of Europe Rep., *supra* at ¶¶ 24-26.

71.    Detainees such as Mr. Al Bakri are typically disappeared by local security forces,

14

often with the assistance of U.S. agents. *See, e.g.,* Center for Human Rights & Global Justice, *Fate and Whereabouts Unknown: Detainees in the "War on Terror,"* at 12, 15, 17 (2005), www.chrgj.org/docs/Whereabouts%20Unknown%20Final.pdf.

72.    Then, detainees are "taken out" in a "carefully choreographed twenty-minute routine, during which a suspect was hog-tied, stripped naked, photographed, hooded, sedated with anal suppositories, placed in diapers, and transported by plane to a secret location." Mayer, *supra*; Priest, *supra. See also,* Council of Europe Rep., *supra,* at ¶ 85.

73.    Many detainees are kept naked for several weeks. *Id.*

74.    Detainees are shackled and handcuffed at all times and are often subjected to months of solitary confinement and extreme sensory deprivation in cramped cells. *Id.*

75.    While in detention, the CIA subjects detainees to interrogation techniques such as:

- extreme sensory depravation;
- prolonged sleep deprivation;
- prolonged complete isolation;
- violently grabbing and shaking prisoners;
- slapping and striking prisoners to cause pain and fear;
- forcing prisoners to stand for upwards of 40 hours or maintain painful stress positions for long periods;
- exposure to temperature extremes for prolonged periods;
- dousing prisoners in freezing water;
- waterboarding prisoners either by binding them to a board, wrapping their faces in plastic and pouring water over them, or strapping them down, putting a washcloth over their faces and pouring water into their noses;

- religious and sexual humiliation;

- keeping prisoners naked for up to 40 days;

- chaining prisoners naked to the floor or ceiling of their cells;

- suspending prisoners from the ceiling by their arms for long periods, toes barely touching the ground;

- enclosure in tiny spaces, such as confining prisoners in coffin-style boxes or "dog boxes" in which prisoners cannot stand, often with limited access to air;

- hooding;

- keeping prisoners in round the clock absolute darkness or in 24 hour a day blinding light;

- bombardment with continuous deafening sounds;

- terrorizing prisoners with military dogs;

- brutally beating, kicking, or striking prisoners with blunt objects such as rifle butts; and

- electric shocks.

*See, e.g,* Mayer, *supra*; Center for Human Rights and Global Justice at the NYU School of Law, *Surviving the Darkness: Testimony from the U.S. "Black Sites,"* Mar. 30, 2008, http://www.amnesty.org/en/library/info/AMR51/177/2005/en; Amnesty International, *United States of America / Yemen: Secret Detention in CIA "Black Sites"* (2008), *available at* http://www.amnesty.org/en/library/info/AMR51/177/2005/en; Human Rights Watch, *Ghost Prisoner: Two Years In Secret CIA Detention* (2007), *available at* http://hrw.org/reports/2007/us0207/us0207web.pdf; Brian Ross & Richard Esposito, *CIA's Harsh Interrogation Techniques Described: Sources Say Agency's Tactics Lead to Questionable*

*Confessions, Sometimes to Death,* ABC News, Nov. 18, 2005, *available at* http://abcnews.go.com/WNT/Investigation/story?id=1322866; Donglas Jehl & David Johnson, *CIA Now Acting Independently to Move Prisoners.* N.Y. TIMES, Mar. 7, 2005, at 4; James R. Schlesinger, et al., *Final Report of the Independent Panel to Review DoD Detention Operations,* Aug. 24, 2004, *available at* http://www.pbs.org/wgbb/pages/frontline/torture/paper/reports.html.

76.    These tactics have led to the death of at least eighty-six detainees in U.S custody since 2002. Human Rights Watch, World Report, at 505 (2006). Dozens of others held by the CIA remain unaccounted for. Dafna Linzer and Julie Tate, *New Light Shed on CIA's 'Black Site' Prisons,* Wash. Post, February 28, 2007 at A01; Priest, *supra*; Ross & Esposito, *supra*.

77.    The CIA refuses the ICRC access to prisoners held in secret detention. Dep't of Justice, *Transcript of Conference Call With Senior Administration Officials on the Executive Order Interpreting Common Article Three,* July 20, 2007, *available at* http://www.usdoj.gov/opa/pr/2006/June/06_opa_411.html (quoting a senior administration official affirming that ICRC access is not a part of Common Article 3); Human Rights First, *The CIA's Secret Detention Program,* May 1, 2008, http://www.humanrightsfirst.org/blog/torture/2008/05/cias-secret-detention-program.html.

78.    In a report based in part on the testimonies of over 30 serving and former members of U.S. and European intelligence services and analysis of computer "data strings" from the international flight planning system, the Council of Europe described the scope and functioning of the CIA's detention and interrogation program. The Council declared that the program "has given rise to repeated serious breaches of human rights," including torture. Comm. on Legal Affairs and Human Rights, Council of Europe, *Secret Detentions and Illegal Transfers of Detainees Involving Council of Europe Member States: Second Report* (June 11,

2007),    http://assembly.coe.int/ASP/NewsManager/EMB_NewsManagerView.asp?ID=2974 (report formally endorsed by over 300 legislators from 47 European countries).

79.    The United States has acknowledged that it uses many of the techniques that have been condemned by the international community.

80.    In mid-2002, in response to queries about the outer boundaries of permissible interrogation techniques then-White House Counsel Alberto Gonzalez asked the Office of Legal Counsel (OLC) of the Department of Justice to determine what interrogation methods were permitted under the U.N. Convention Against Torture (CAT). The resulting memo—the "Bybee Memorandum"—stated that painful interrogation techniques were permissible so long as the pain caused was less intense than that accompanying organ failure or death. U.S. Department of Justice Office of Legal Counsel, *Memorandum to Alberto Gonzales, Counsel to the President: Standards of Conduct for Interrogation under 18 U.S.C. §§ 2340-2340A*, Aug. 1, 2002, *available at*    http://www.washingtonpost.com/wp-dyn/articles/A38894-2004Jun13.html    (hereinafter "August 2002 Memo").

81.    In March, 2003, a similar memorandum was produced for the Department of Defense by John Yoo, then Deputy Assistant Attorney General, stating executive branch interrogation of detainees outside the United States was beyond the reach of the law. U.S. Department of Justice, Office of Legal Counsel, Memorandum for William J. Haynes, II, General Counsel of the Department of Defense:  Military Interrogation of Unlawful Combatants Held    Outside    the    United    States,    March    14,    2003,    *available    at* www.aclu.org/pdfs/safefree/yoo_army_torture_memo.pdf (hereinafter "March 2003 Memo")

82.    Moreover, top government lawyers and officials have argued that if the interrogator's objective is to obtain information—rather than inflict pain or humiliate—no legal

liability will attach, even if severe pain and suffering are "reasonably likely to result." *See* August 2002 Memo, *supra*, at 3-4; March 2003 Memo, *supra* at 37.; Mark Mazzetti, *Letters Give CIA Tactics a Legal Rationale*. N.Y. TIMES, April 27, 2008, at A1.

83.    The Bybee and Yoo memoranda were leaked, causing enormous public outcry. Thereafter, the Justice Department repudiated the memo, and CIA Inspector General John Helgerson found that the agency's interrogation techniques constituted cruel, inhuman and degrading treatment, before the Agency subjected him to investigation. Mark Mazzetti & Scott Shane, *Watchdog of CIA is Subject of CIA Inquiry*, N.Y. TIMES, Oct. 11, 2007.

84.    On May 19, 2006, the United Nations' Committee Against Torture formally called for the United States to publicly condemn any policy of secret detention as well as to "rescind any interrogation technique, including methods involving sexual humiliation, 'water boarding', 'short shackling' and using dogs to induce fear, that constitute torture or cruel, inhuman or degrading treatment or punishment, in all places of detention under its *de facto* effective control, in order to comply with its obligations under the Convention [Against Torture]." U.N. Comm. Against Torture, *Consideration Of Reports Submitted By States Parties Under Article 19 Of The Convention, Conclusions and Recommendations of the Committee Against Torture: United States*, CAT/C/USA/CO/2, at ¶¶ 17, 24 (May 18, 2006), *available at* http://huachen.org/english/bodies/cat/cats36.htm.

85.    On February 14, 2007, the European Parliament passed a resolution condemning CIA practices, "recall[ing] that imposing or executing or allowing directly or indirectly secret and illegal detentions, which are instruments resulting in people's 'disappearance', constitute serious violations of human rights per se and that the active or passive involvement in such secret and illegal detentions by a European country renders that county responsible under the

19

[European Convention on Human Rights]" and requiring that European countries "take active steps to prevent any other authority from operating detention centres which are not subject to political and judicial oversight or where *incommunicado* detention is permitted." European Parliament, *Resolution on the Alleged Use of European Countries by the CIA for the Transportation and Illegal Detention of Prisoners*, 2006/2200(INI), at ¶¶ 158, 196 (Feb. 14, 2007), *available* *at* http://www.europarl.europa.eu/ocil/FindByProenum.do?lang=2&procnum=INI/2006/2200.

86.    Despite the repeated calls for closure of the secret facilities and inercasingly widespread knowledge about the torture and inhuman, degrading treatment that occur in these facilities, the program is ongoing. Dafna Linzer, *CIA Held Al-Qaeda Suspect Secretly: Officials Disclose That Use of Overseas Prisons Resumed*, WASH. POST, Apr. 28, 2008, at A16; Human Rights First, *CIA's Secret Detention Program*, *supra.*

87.    In legal filings in April, 2008, the CIA acknowledged that the program "will continue." Human Rights First, *CIA Acknowledges It Has More Than 7,000 Documents Relating to Secret Detention Program, Rendition, and Torture*, Apr. 23, 2008, http://www.humanrightsfirst.org/blog/torture/2008/05/cias-secret-detention-program.html.

**V.**
**CAUSES OF ACTION**

**FIRST CLAIM FOR RELIEF**

**ARTICLE I OF THE UNITED STATES CONSTITUTION—**
**VIOLATION OF THE SUSPENSION CLAUSE**

88.     Petitioners incorporate by reference all preceding paragraphs as if set forth fully

herein.

89.     Respondents' arrest and continued detention of Mr. Al Bakri violate the United

States Constitution, Habeas Corpus Suspension Clause, Art. I, § 9, cl. 2, because the Suspension

Clause guarantees him the right to be charged criminally or released.  Petitioner has been and

continues to be detained without charge.

90.     Respondents' arrest and continued detention of Mr. Al Bakri violate the United

States Constitution, Habeas Corpus Suspension Clause, Art. I, § 9, cl. 2, because the Suspension

Clause guarantees Petitioner the right to an adequate and meaningful judicial process.  Petitioner

has been and continues to be detained without such process.

91.     Respondents have seized and continue to detain Mr. Al Bakri without affording

him fundamental due process.

92.     Accordingly, this Court should grant Petitioners' petition for writ of habeas

corpus, order Mr. Al Bakri's immediate release from custody, and enter declaratory, injunctive,

and any other relief the Court may deem appropriate.

**SECOND CLAIM FOR RELIEF**

**DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT**
**TO THE UNITED STATES CONSTITUTION—**
**UNLAWFUL DEPRIVATION OF LIBERTY**

93.     Petitioners incorporate by reference all preceding paragraphs.

21

94.    Through forced disappearance and prolonged arbitrary detention without process, Respondents, acting under color of law, continue to hold Mr. Al Bakri in custody in violation of his right to both substantive and procedural due process under the Fifth Amendment to the Constitution of the United States.

95.    Mr. Al Bakri is not, nor has he ever been, an enemy alien, lawful or unlawful belligerent, or combatant of any kind.    As a civilian abducted thousands of miles from any battlefield, he cannot be lawfully subjected to military detention.  *Hamdi v. Rumsfeld*, 542 U.S. 507, 522 n.1 (2004).

96.    In the alternative, even under the standards for military detention, Respondents' actions have denied and continue to deny Mr. Al Bakri the process accorded to persons seized and detained by the United States military in a zone of armed conflict, as established by, *inter alia, Hamdi, supra*, the Uniform Code of Military Justice, Army Regulation 190-8, the Third Geneva Convention art. 3 & 5, Aug. 12, 1949, 6 U.S.T. 3316, the Fourth Geneva Convention art. 3 & 5, Aug. 12, 1949, 6 U.S.T. 3516, and customary international law as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

97.    To the extent that Respondents claim that Mr. Al Bakri's detention is authorized by Executive Order, that Order violates the Fifth Amendment and fundamental due process rights both as applied to Mr. Al Bakri and on its face.

98.    Accordingly, Petitioners are entitled to habeas, declaratory, and injunctive relief as well as any other relief the Court may deem appropriate.

**THIRD CLAIM FOR RELIEF**

**FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION—
VIOLATION OF THE RIGHT TO COUNSEL
AND TO ACCESS TO THE COURTS**

99.    Petitioners incorporate by reference all preceding paragraphs.

100.    By denying Mr. Al Bakri access to counsel or the courts to present his valid claims stated herein, including but not limited to his right to be free from unlawful and arbitrary detention under the Suspension Clause, the Fifth Amendment and the Administrative Procedure Act and his right to be free from treatment that shocks the conscience and/or cruel and unusual punishment under the Fifth and Eighth Amendments to the United States Constitution, Respondents have violated his rights under the Fifth and Sixth Amendments to the United States Constitution.

101.    Accordingly, Petitioners are entitled to habeas, declaratory, and injunctive relief as well as any other relief the Court may deem appropriate.

**FOURTH CLAIM FOR RELIEF**

**ARTICLE II OF THE UNITED STATES CONSTITUTION—
UNLAWFUL DETENTION**

102.    Petitioners incorporate by reference all preceding paragraphs.

103.    Because Mr. Al Bakri is not, nor has he ever been, an enemy alien, lawful or unlawful belligerent, or combatant of any kind, the Executive lacks the authority to order or direct military officials to detain civilians who were not "carrying a weapon against American troops on a foreign battlefield." *Hamdi v. Rumsfeld*, 542 U.S. 507, 522 n.1 (2004).

104.    By the actions described above, President Bush has exceeded and continues to exceed the Executive's authority under Article II of the United States Constitution by authorizing, ordering and directing that military officials seize Mr. Al Bakri and transfer him to

military detention. and by authorizing and ordering his continued military detention. Respondents acted and continue to act without lawful authority by directing, ordering, and/or supervising the seizure and military detention of Mr. Al Bakri.

105.    To the extent that the Executive asserts that Petitioner's detention is authorized by the November 13. 2001 Executive Order, 66 Fed. Reg. 57,833, §2, that Order exceeds the Executive's authority under Article II and is *ultra vires* and void as applied to Mr. Al Bakri and on its face. The military seizure and detention of Mr. Al Bakri by the Respondents is *ultra vires* and illegal because it is in violation of Article II of the United States Constitution.

106.    To the extent that Respondents assert that their authority to detain Petitioner derives from a source other than the Executive Order, including without limitation the Executive's inherent authority to conduct foreign affairs or to serve as Commander-in-Chief of the U.S. Armed Forces, whether from Article II of the Constitution or otherwise, Respondents lack that authority as a matter of fact and law.

107.    Accordingly, Petitioners are entitled to habeas, declaratory, and injunctive relief as well as any other relief the Court may deem appropriate.

### FIFTH CLAIM FOR RELIEF

### EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION— VIOLATION OF THE PROHIBITION OF CRUEL AND UNUSUAL PUNISHMENT

108.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

109.    By the actions described above, Respondents, acting under color of law, have violated Mr. Al Bakri's right to be free from cruel and unusual punishment under the Cruel and Unusual Punishments Clause of the Eighth Amendment to the Constitution of the United States.

110.    Accordingly, Petitioners are entitled to declaratory and injunctive relief as well as

24

any other relief the Court may deem appropriate.

## SIXTH CLAIM FOR RELIEF

### FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION— VIOLATION OF THE PROHIBITION AGAINST TREATMENT THAT SHOCKS THE CONSCIENCE

111.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

112.    By the actions described above, Respondents, acting under color of law, have violated Mr. Al Bakri's right to be free from abusive treatment that shocks the conscience under the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

113.    Accordingly, Petitioners are entitled to declaratory and injunctive relief as well as any other relief the Court may deem appropriate.

## SEVENTH CLAIM FOR RELIEF

### COMMON LAW DUE PROCESS— UNLAWFUL DEPRIVATION OF LIBERTY

114.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

115.    The forced disappearance and prolonged arbitrary detention by Respondents, acting under color of law, of Amin Al Bakri, have deprived him of his liberty for almost six years in violation of common law principles of due process.

116.    Accordingly, Petitioners are entitled to habeas, declaratory, and injunctive relief as well as any other relief the Court may deem appropriate.

## EIGHTH CLAIM FOR RELIEF

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT—
### ARBITRARY AND CAPRICIOUS UNLAWFUL DETENTION

117.    Petitioners incorporate by reference all preceding paragraphs.

118.    Army Regulation 190-8 prohibits the detention of civilians who were seized away from the field of battle or who were not engaged in combat against the United States. *See, e.g.,* Army Reg. 190-8 at 1-6(g) ("Persons who have been determined by a competent tribunal not to be entitled to prisoner of war status may not be executed, imprisoned, or otherwise penalized without further proceedings to determine what acts they have committed and what penalty should be imposed."). *See also* 10 U.S.C. § 893 (2006) (prohibiting unlawful detention)

119.    By arbitrarily and capriciously detaining Mr. Al Bakri in military custody in the manner described above, Respondents have acted and continue to act *ultra vires* and unlawfully in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2) (2006).

120.    Accordingly, Petitioners are entitled to habeas, declaratory, and injunctive relief as well as any other relief the Court may deem appropriate.

## NINTH CLAIM FOR RELIEF

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT—
### TORTURE, CRUEL, INHUMAN OR DEGRADING TREATMENT

121.    Petitioners incorporate by reference all preceding paragraphs.

122.    By the actions described above, the Respondents have acted and continue to act arbitrarily and capriciously by directing, ordering, confirming, ratifying, and/or conspiring to unlawfully subject Mr. Al Bakri to torture and/or cruel, inhuman or degrading treatment in violation of Army Regulation 190-8 and the Administrative Procedure Act, 5 U.S.C. § 706(2) (2006).

123.    Accordingly, Petitioners are entitled to declaratory, and injunctive relief as well as any other relief the Court may deem appropriate.

## TENTH CLAIM FOR RELIEF

### INTERNATIONAL HUMANITARIAN AND HUMAN RIGHTS LAW— ARBITRARY DENIAL OF DUE PROCESS

124.    Petitioners incorporate by reference all preceding paragraphs.

125.    To the extent that any claim can be sustained that armed conflict existed in territories in which Mr. Al Bakri resided or traveled for lawful business purposes, Respondents have denied and continue to deny Mr. Al Bakri the process due to persons seized and detained by the United States military in zones of armed conflict, as established by customary international humanitarian and human rights law as reflected, expressed, and defined in multilateral treaties and other international instruments and domestic judicial decisions, and other authorities.

126.    Because Respondents are detaining Mr. Al Bakri "under or by color of the authority of the United States" and "in violation of the Constitution or laws or treaties of the United States," his claim arises under 28 U.S.C. § 2241 (2006), and he is entitled to habeas relief.

127.    Petitioners are also entitled to declaratory and injunctive relief as well as any other relief the Court may deem appropriate.

## ELEVENTH CLAIM FOR RELIEF

### INTERNATIONAL HUMANITARIAN AND HUMAN RIGHTS LAW— TORTURE, CRUEL, INHUMAN OR DEGRADING TREATMENT

128.    Petitioner incorporates by reference all preceding paragraphs.

129.    By the actions described above, Respondents have denied and continue to deny Mr. Al Bakri the right to be free from torture, cruel, inhuman or degrading treatment of all

persons seized and detained by the United States military in times of armed conflict as establish by customary international humanitarian and human rights law—as reflected, expressed, and defined in multilateral treaties and other international instruments and domestic judicial decisions, and other authorities.

130.    Because Respondents are detaining Mr. Al Bakri "under or by color of the authority of the United States" and "in violation of the Constitution or laws or treaties of the United States," Petitioners are entitled to declaratory and injunctive relief as well as any other relief the court may deem appropriate.

**TWELFTH CLAIM FOR RELIEF**

**GENEVA CONVENTIONS—ARBITRARY DENIAL OF DUE PROCESS**

131.    Petitioners incorporate by reference all preceding paragraphs.

132.    By the actions described above, Respondents, acting under color of law, have denied and continue to deny Mr. Al Bakri the process accorded to persons seized and detained by the United States military in times of armed conflict as established by specific provisions of the Third and Fourth Geneva Conventions.

133.    Respondents are liable for this conduct described above, insofar as they set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, and/or conspired to violate the Geneva Conventions.

134.    Accordingly, Petitioners are entitled to habeas, declaratory, and injunctive relief as well as any other relief the court may deem appropriate.

## THIRTEENTH CLAIM FOR RELIEF

### GENEVA CONVENTIONS—
### TORTURE, CRUEL, INHUMAN OR DEGRADING TREATMENT

135.    Petitioners incorporate by reference all preceding paragraphs.

136.    By the actions described above, Respondents have denied and continue to deny Mr. Al Bakri the right to be free from torture, cruel, inhuman or degrading treatment of all persons seized and detained in times of armed conflict as establish by customary international humanitarian and human rights law as established by specific provisions of the Geneva Conventions.

137.    Respondents are liable for this conduct described above, insofar as they set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, and/or conspired to violate the Geneva Conventions.

138.    Accordingly, Petitioners are entitled to declaratory and injunctive relief as well as any other relief the court may deem appropriate.

### V.
### PRAYER FOR RELIEF

**WHEREFORE**, Petitioners pray for relief as follows:

1.    Grant Petitioner Muhammad Al Bakri Next Friend status, as Next Friend of Amin Al Bakri;

2.    Order Petitioner Amin Al Bakri released from Respondents' unlawful custody;

3.    Order Respondents to allow counsel to meet and confer with the detained Petitioner Amin Al Bakri, in private and unmonitored attorney-client conversations;

4.    Order Respondents to cease all acts of torture; cruel, inhuman and degrading treatment; and all other outrages upon the personal dignity of Petitioner Al Bakri;

29

5.      Order Respondents to cease all interrogations of Petitioner Al Bakri, direct or indirect, while this litigation is pending;

6.      Order Respondents to make a prompt return to the writ in accordance with 28 U.S.C. § 2243 (2006) and to the extent Respondents contest any material factual allegations in this Petition, schedule an evidentiary hearing, at which Petitioners may adduce proof in support of their allegations; and

7.      Such other relief as the Court may deem necessary and appropriate to protect the detained Petitioner Amin Al Bakri's rights under the Constitution and laws of the United States and International Law.

DATED:     JULY 28, 2008


Respectfully submitted,

Ramzi Kassem
Hope R. Metcalf
Michael J. Wishnie
*Supervising Attorneys*

Amanda W. Shanor                                         *Of Counsel*
Leah F. Belsky
Michael T. Allen                                         Tina Monshipour Foster
*Law Student Interns*                                    Barbara Olshansky
                                                         International Justice Network
Allard K. Lowenstein International Human Rights Clinic    P.O. Box 610119
National Litigation Project                              New York, NY 11361-0119
Yale Law School                                          (t) (917) 442-9580
127 Wall Street                                          (e) tina.foster@ijnetwork.org
New Haven, CT 06511
(t) (203) 432-0138
(f) (203) 432-1222
(e) ramzi.kassem@yale.edu

*Counsel for Petitioner*

**VERIFICATION**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on this 28th day of July, 2008.

_____        _____        _____
RAMZI KASSEM                     HOPE R. METCALF                   MICHAEL J. WISHNIE

## CERTIFICATION OF REPRESENTATION WITHOUT COMPENSATION

Counsel for Petitioner hereby certify, pursuant to L. Cv. R. 83.2(g), that they are representing Petitioner Amin Al Bakri without compensation.

Dated: July 2⁴, 2008

_____      _____      _____
RAMZI KASSEM       HOPE R. METCALF       MICHAEL J. WISHNIE

Allard K. Lowenstein International Human Rights Clinic
National Litigation Project
Yale Law School
127 Wall Street
New Haven, CT 06511
(t) (203) 432-0138
(f) (203) 432-1222

*Counsel for Petitioner Amin Al Bakri*

33

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS

Amin Al Bakri and Muhammad Al Bakri as his Next Friend

## DEFENDANTS

George Bush, Robert Gates, John Doe I, and John Doe II

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** 99999
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT 11011
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**
Ramzi Kassem, Hope Metcalf, Michael Wishnie
Allard K. Lowenstein International Human Rights Clinic
National Litigation Project
Yale Law School
127 Wall Street
New Haven, CT 06511
(t) (203) 432-0138

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

⦿ 2 U.S. Government Defendant

○ 3 Federal Question
(U.S. Government Not a Party)

○ 4 Diversity
(Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ⦿ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ⦿ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**   OR   ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ⊙ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| [X] 530 Habeas Corpus-General <br> ☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) <br><br> *(If pro se, select this deck)* | ☐ 895 Freedom of Information Act <br> ☐ 890 Other Statutory Actions (if Privacy Act) <br><br> *(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act <br> ☐ 720 Labor/Mgmt. Relations <br> ☐ 730 Labor/Mgmt. Reporting & Disclosure Act <br> ☐ 740 Labor Railway Act <br> ☐ 790 Other Labor Litigation <br> ☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act) <br> ☐ 443 Housing/Accommodations <br> ☐ 444 Welfare <br> ☐ 440 Other Civil Rights <br> ☐ 445 American w/Disabilities-Employment <br> ☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance <br> ☐ 120 Marine <br> ☐ 130 Miller Act <br> ☐ 140 Negotiable Instrument <br> ☐ 150 Recovery of Overpayment & Enforcement of Judgment <br> ☐ 153 Recovery of Overpayment of Veteran's Benefits <br> ☐ 160 Stockholder's Suits <br> ☐ 190 Other Contracts <br> ☐ 195 Contract Product Liability <br> ☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

28 USC s. 2241. Plaintiff petitions for habeas corpus review and release from unlawful detention in U.S. custody.

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** [____] <br> **JURY DEMAND:** | Check YES only if demanded in complaint <br> YES [___] NO [___] |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES [___]   NO [X]   If yes, please complete related case form.

DATE  7/28/08    SIGNATURE OF ATTORNEY OF RECORD

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States

III. CITIZENSHIP OF PRINCIPAL PARTIES. This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY. If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form