[ORAL ARGUMENT REQUESTED]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FADI AL-MAQALEH, *et al.*,**<br>**Petitioners,**<br>**v.**<br>**BARACK H. OBAMA, *et al.*,**<br>**Respondents.** | **Civil Action No. 06-1669 (JDB)** |
| **AMIN AL-BAKRI, *et al.*,**<br>**Petitioners,**<br>**v.**<br>**BARACK H. OBAMA, *et al.*,**<br>**Respondents.** | **Civil Action No. 08-1307 (JDB)** |
| **REDHA AL-NAJAR, *et al.*,**<br>**Petitioners,**<br>**v.**<br>**BARACK H. OBAMA, *et al.*,**<br>**Respondents.** | **Civil Action No. 08-2143 (JDB)** |

**PETITIONERS' OPPOSITION TO RESPONDENTS' MOTION TO DISMISS AMENDED PETITIONS FOR WRITS OF HABEAS CORPUS**

**PRELIMINARY STATEMENT**

Petitioners Fadi al-Maqaleh, Amin al-Bakri, and Redha al-Najar ("Petitioners") are civilians currently imprisoned in U.S. military custody at Bagram Air Base in Afghanistan. The three men are among a tiny fraction of the total Bagram Air Base prison population who share the following traits: (1) they are third country nationals (*i.e.* non-Afghan citizens); (2) they were seized outside of Afghanistan and rendered to U.S. military custody at Bagram Air Base by Respondents against their will; and (3) they have been detained without access to counsel or any court of law for seven or more years.

On April 2, 2009, this Court held that Petitioners were "entitled to seek habeas review in this Court." *Maqaleh v. Gates*, 605 F. Supp. 2d 205, 235 (D.D.C. 2009). At Respondents' request, the Court certified its decision for interlocutory appeal pursuant to 28 U.S.C. §1292 (b). *See Maqaleh v. Gates*, 620 F. Supp. 2d 51 (D.D.C. 2009). Because Petitioners overcame Respondents' Motion to Dismiss and no jurisdictional discovery had been taken, the consolidated cases were presented on appeal with an extremely thin factual record. On May 21, 2010, the U.S. Court of Appeals for the D.C. Circuit reversed this Court's decision, holding that Petitioners were not entitled to avail themselves of the protections of the Suspension Clause. *Maqaleh v. Gates*, 605 F.3d 84 (D.C. Cir. 2010).

In the wake of the Court of Appeals' reversal, Petitioners discovered additional evidence highly pertinent to the jurisdictional analysis. Accordingly, Petitioners sought panel rehearing before the Court of Appeals. *See* Joint Pet. for Panel Reh'g, *Maqaleh v. Gates,* No. 09-5265 (D.C. Cir. July 6, 2010). Although the Court of Appeals denied rehearing, it nevertheless acknowledged that Petitioners had cited evidence that had not been considered below, and therefore issued its opinion "without prejudice to [Petitioners'] ability to present [new] evidence

to the district court in the first instance." *Maqaleh v. Gates*, No. 09-5265 (D.C. Cir. July 23, 2010). Petitioners then sought and were granted leave to file amended petitions. *See Al-Maqaleh v. Gates*, No. 06-1669 (JDB) (D.D.C. Mar. 25, 2011) (Order granting Petitioners' Joint Motion to Amend Petitions for Writ of Habeas Corpus). The Amended Petitions[1] are the subject of Respondents' Motion to Dismiss Amended Petitions for Writ of Habeas Corpus (filed May 19, 2011), now pending before the Court.

In their Motion, Respondents proffer new evidence that they claim supports their contention that no Article III court may hear habeas corpus cases brought by third-country nationals being held at Bagram. However, Respondents' evidence and arguments suggest merely that courts should not interfere with U.S. detention policy at Bagram with regard to Afghan prisoners, not third country nationals like Petitioners. Moreover, Respondents now submit evidence contradicting prior representations made to the Court of Appeals upon which that court relied in deciding whether it had habeas jurisdiction in these joined cases. At the time when the Court of Appeals it made its determination regarding the site of detention, it was likely under the impression that Respondents did *not* intend to occupy Bagram for the long term. But the declarations offered by Respondents now reveal that the U.S. government will retain control over some of the prison facilities at Bagram where third country nationals, like Petitioners, will continue to be held – even after the transfer of a portion of the facilities to the Afghan government is complete.

In order to determine its subject matter jurisdiction pursuant to the fact-specific, functional analysis set forth by the Supreme Court in *Boumediene v. Bush*, 553 U.S. 723 (2008), this Court must now consider new evidence which was not available to the Court of Appeals.

[1] The Amended Petitions were all filed in this Court on April, 4, 2011. *See* Second Am. Pet. for Writ of Habeas Corpus, *Al-Maqaleh v. Obama*, No. 06-1669; Am. Pet. for Writ of Habeas Corpus, *Al-Bakri v. Obama*, No. 08-1307; and First Am. Pet. for Writ of Habeas Corpus, *Al-Najar v. Obama*, No. 08-2143.

The Court's role in finding facts sufficient to determine its own jurisdiction is vital to maintaining the separation of powers. Indeed, for the Court to do anything less here would undermine the Great Writ, which "allows the Judicial Branch to … [serve] as an important judicial check on the Executive's discretion in the realm of detentions." *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004). In these cases, where the writ is truly that "indispensable mechanism" which "maintain[s] the delicate balance of governance that is itself the surest safeguard of liberty," *Boumediene*, 553 U.S. at 745, 765 (internal citations omitted), the Court's path should be clear. The Court must either allow these cases to proceed, or at the very least permit the taking of limited discovery in order to make factual findings required to assess its own jurisdiction.

**STATEMENT OF NEW FACTS NOW BEFORE THE COURT**

Though Petitioners and Respondents characterize the facts differently, it is undisputed that there have been significant changes at Bagram since May 2010, when the Court of Appeals issued its ruling in these consolidated cases. Petitioners now proffer newly-discovered evidence relevant to each prong of the *Boumediene* analysis, including: Petitioners' status and the adequacy of the process used to make that determination (*see* Part II, *infra*); Respondents' objective degree of control over Bagram and their plans to continue to detain indefinitely third country nationals like Petitioners there (*see* Part III, *infra*); and the absence of any meaningful "practical obstacles" to the extension of the writ to these Petitioners (*see* Part IV, *infra*). Petitioners also submit newly-discovered evidence that Respondents manipulated Petitioners' site of detention in order to evade judicial review (*see* Part V, *infra*). This Court should consider manipulation alongside the other factors in its jurisdictional analysis as both the Court of Appeals' ruling and *Boumediene* before it contemplated the possibility of additional, relevant

factors. Petitioners have now been held without charge, virtually incommunicado and without access to counsel, for seven years. Indeed, two years have passed since this Court held that the protracted length of Petitioners' imprisonment weighed in favor of the writ's extension. *Al-Maqaleh v. Gates*, 604 F. Supp. 2d 205, 235 (D.D.C. 2009).

Respondents appear to question whether the evidence proffered by Petitioners is, in fact, "newly discovered." *See* Resp'ts' Mot. at 2. Of course, Respondents may have been aware of much of this evidence previously, yet chosen not to present it to this Court for consideration in this litigation. In fact, Respondents have gone to great lengths to prevent the disclosure of any information regarding Petitioners' detention by denying them any access to counsel (though such access is now routinely provided to non-Afghan Bagram detainees). *See* Part III, *infra.*

Respondents have also selectively presented or withheld information within their exclusive knowledge that is highly pertinent to the Court's determination of its jurisdiction, including information regarding Petitioners' sites of apprehension, prior sites of detention, transfers from one prison location to another, conditions of confinement, circumstances of interrogation, history of status determinations, and evidence adduced in any proceedings. Petitioners' counsel only recently became aware of the additional facts discussed below, despite Respondents' decision not to present them to the Court in these proceedings at all.

As discussed in further detail in Part VI below, this Court must either credit Petitioners' allegations as true, or else permit limited discovery so Petitioners have an opportunity to uncover facts that are highly relevant to the Court's determination of its subject matter jurisdiction.

The new jurisdictional facts now before the Court fall into the following categories: (1) changes to the prison facilities and population of detainees incarcerated at Bagram Air Base which have been objectively observed; (2) changes to Respondents' stated policies and

procedures with respect to the detention and treatment of detainees incarcerated at Bagram Air Base; and (3) information regarding Petitioners' sites of apprehension, prior sites of detention, status determinations, and periodic review procedures.

***Changes at Bagram Air Base***

In June 2010, a few weeks after the Court of Appeals issued its opinion in this case, Respondents began facilitating full-blown civilian trials of Afghan detainees at Bagram. According to Respondents, in less than one year, they have overseen 130 trials at Bagram and are actively preparing "more than 550 cases" for trial. Decl. of William K. Lietzau, at ¶ 7, *Al-Maqaleh v. Gates*, Civ. No. 06-1169 (JDB), Attached as Ex. 1 to Resp'ts' Mot. ("Lietzau Decl."). Though Respondents continue to deny Petitioners' counsel any access to Bagram Air Base, Afghan civilian lawyers and witnesses, along with journalists and observers from all over the world have travelled to and from these proceedings on the Base without incident. *See infra*, discussion at Part V. It is difficult to imagine a legitimate basis for such differential treatment of detainees' U.S.-based counsel. At the very least, Respondents' involvement in so many public judicial proceedings belies any previously articulated claim that proximity to the battlefield renders Article III judicial review impracticable.

***Respondents' Statements Concerning Detainee Policy***

In support of their factual claims regarding detention policy, Respondents rely on the declarations of Deputy Assistant Secretary of Defense William K. Lietzau and Vice Admiral Robert S. Harward. The documents are offered by Respondents as evidence of their stated intent eventually to transfer all Afghan detainees being held at Bagram Air Base to Afghan custody. *See* Lietzau Decl. ¶ 3; Decl. of Robert S. Harward ¶ 6, *Al-Maqaleh v. Gates,* Civ. No. 06-1169 (JDB), Attached as Ex. 2 to Resp'ts' Mot. ("Harward Decl.").

While both declarations summarize Respondents' purported plans to transfer Afghan detainees to the custody of the Afghan government, they fail to mention any definite plans for third country nationals, such as Petitioners, being held at Bagram. The omission casts in bold relief the critical question of what Respondents intend for Petitioners and other third-country nationals if and when the transfer of custody of Afghan detainees is someday completed.

Certainly, Respondents' declarations do not indicate any intention to transfer Petitioners or other third country nationals to the custody of the Afghan government. To the contrary, Mr. Lietzau's Declaration implies that Petitioners will continue to be detained indefinitely even after all Afghan detainees have been transferred. *See* Lietzau Decl. ¶ 5 (stating that Respondents are building "additional detainee housing capacity" to enable U.S. forces to continue detention operations "pending the transfer of non-Afghan detainees to their home countries or third countries"); *id.* at ¶10 ("U.S. forces may need to maintain some detention capacity in Afghanistan, pursuant to the law of war, as long as military operations continue.").

In sharp contrast to Respondents' undertaking of the obligation to transfer Afghan detainees to the Afghan government within a general timeframe, Lietzau Decl. ¶ 3, Respondents have unequivocally retained authority to detain third country nationals at Bagram Air Base without any judicial oversight. And while hundreds of Afghan detainees have been released from Bagram Prison, Petitioners' detention remains indefinite given that they are citizens of countries with no recent precedent for repatriation (*i.e.* Yemen and Tunisia).[2]

***New Evidence Regarding Petitioners' Sites of Apprehension, Detention, Status Determinations, and Review Processes***

In their Motion, Respondents assert that each Detainee Review Board ("DRB") to have assessed Petitioners found them to have "met the criteria for internment." *See* Harward Decl. ¶¶

[2] Petitioners are unaware of any transfers of detainees from Bagram to Yemen or Tunisia since the first of these cases was originally filed in 2006.

15, 18, 21. What Respondents' declarations fail to reflect is that the DRBs have also apparently determined that Petitioners are eligible for release. *See, e.g.*, Decl. of Ramzi Kassem, dated June 22, 2011, at ¶¶ 8, 23 (Attached hereto as Ex. 2) ("Kassem Decl.").

Indeed, a U.S. military officer overseeing the work of personal representatives at Bagram confirmed in writing to undersigned counsel that Mr. al-Bakri had been found eligible for release at his penultimate DRB, which had occurred in August 2010. *See* Email from Col. Margaret S. Bond to Counsel (Attachment 4 to Kassem Decl.). Counsel for Mr. al-Bakri also received a document from Mr. al-Bakri's family entitled "DRB Results Notice," which confirmed that, following the August 2010 DRB, U.S. military authorities recommended Mr. al-Bakri's release and repatriation. *See* Oct. 31, 2010 DRB Results Notice for ISN 1464 (Attachment 10 to Kassem Decl.).

Respondents' contention that Mr. al-Bakri, along with the other Petitioners, has always "met the criteria for internment," is at best misleading and underscores the dangers of unchecked Executive power when individual liberty is at stake. The fact that Mr. al-Bakri was initially designated as an "enduring security threat," subsequently approved for release, and then brought before another DRB, highlights the arbitrariness of the procedures that Respondents have put in place at Bagram Air Base. Mr. al-Bakri's experience with the DRB teaches a tragic lesson about what happens in the absence of accountability, where there is no avenue for appeal to a neutral decision-maker.

That the DRB remains fundamentally flawed with procedures that are woefully inadequate is supported by additional, recently uncovered information. For example, DRB personal representatives have no ability to make telephone calls to witnesses unless those witnesses happen to be located in the United States or Afghanistan. *See* Kassem Decl. ¶¶ 16-18.

This restriction is not merely an abstract concern. In Petitioner al-Bakri's latest DRB, this meant that he was unable to dial-in a key witness from the Yemeni government who was eagerly awaiting the telephone call in Sana'a to testify. *See id.* at ¶ 17-18. The fact that DRB staff cannot even place a routine international telephone call (there is no obstacle to dialing Yemen from a regular Afghan landline or mobile telephone), demonstrates that Petitioners are not even able to call readily available witnesses to testify. Overall, the hypothetical ability afforded Afghan prisoners to call witnesses either to testify in-person or via telephone—which Respondents suggest is a major modification to the DRB scheme—provides no benefit whatsoever to Petitioners and other third country nationals.

At a minimum, the information discovered by Petitioners' counsel despite Respondents' decision not to reveal these facts about the DRBs should give this Court pause before crediting Respondents' untested factual assertions about Petitioners' status, or regarding the adequacy of the procedures employed to determine their status.

## STANDARD OF REVIEW

As discussed more fully below, Respondents do not rely solely on legal argument in their Motion to Dismiss, but also challenge the factual allegations set forth in the Amended Petitions by selectively choosing to ignore, deny, or dispute them, and in some instances offering contradictory evidence in the form of declarations. Petitioners maintain that there is already sufficient evidence in the record to support the Court's extension of the Great Writ to Petitioners. However, should the Court rely on any disputed issue of fact in determining whether it has subject matter jurisdiction, it must either credit Petitioners' factual allegations as true, or else permit them an opportunity to discover evidence in support of their allegations through jurisdictional discovery.

The circuit courts are nearly unanimous in their approach to challenges to subject matter jurisdiction, determining the degree of procedural protection to be accorded one party's allegations based on the nature of the other's attack.[3] This circuit has articulated and consistently followed one of the most stringent iterations of the rule. When one party challenges solely the legal sufficiency of another's jurisdictional allegations, the trial court may resolve the challenge on the face of the complaint. *See Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992). In so doing, it must apply a standard patterned on Rule 12(b)(6) and assume the truth of the facts alleged. *See Sledge v. United States*, 723 F. Supp. 2d 87, 91 (D.D.C. 2010). In such a case, the motion to dismiss must be denied so long as the complaint contains sufficient concrete facts to invoke jurisdiction.

If a party instead attacks the veracity of the jurisdictional allegations—*i.e.*, challenges the factual predicate of jurisdiction—the court may go beyond the allegations of the complaint and accept other evidence. *See, e.g., Gonzalez v. United States*, 284 F.3d 281, 287-88 (1st Cir. 2002); *Valentin v. Hospital Bella Vista*, 254 F.3d 358, 362-65 (1st Cir. 2001); *Montez v. Department of Navy*, 392 F.3d 147, 149 (5th Cir. 2004). However, if a court considers evidence outside the allegations of the complaint, it should hold an evidentiary hearing to determine if there are

---

[3]*See, e.g., Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009) (in facial challenge to jurisdiction, plaintiff gets presumption of truthfulness of facts alleged; in challenge to veracity of factual allegations of jurisdiction, court must conduct evidentiary proceedings and resolve disputed jurisdictional facts); *McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 290-91 (3d Cir. 2006) (where defendant does not challenge facts, court may rule on motion by accepting allegations as true; if defendant contests jurisdictional allegations, court must permit plaintiff to respond with rebuttal evidence in support of jurisdiction and then decide jurisdictional issue by weighing evidence); *Garcia v. Copenhaver, Bell & Assocs., M.D.S.*, 104 F.3d 1256, 1260-61 (11th Cir. 1997) (describing different analyses used for facial and factual attacks); *see also Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (stating rule); *Oaxaca v. Roscoe*, 641 F.2d 386, 391 (5th Cir. 1981) (stating rule); *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990) (stating rule). *But see Freeman v. United States*, 556 F.3d 326, 343 (5th Cir. 2009) (affirming that limited discovery was not required because any mandatory directive could be found in public domain and plaintiffs failed to justify need for discovery).

sufficient facts to support the jurisdictional allegations. *See Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009); *Rosales v. United States*, 824 F.2d 799, 803 (9th Cir. 1990); *Barrett v. United States*, 853 F.2d 124, 131 (2d Cir. 1988).

Finally, in cases where the jurisdictional facts are intertwined with facts central to the merits, the presumption of truthfulness attaches, and the plaintiff must be afforded the same procedural safeguards—such as discovery—that would apply were he facing a direct attack on the merits. *See Valentin*, 254 F.3d at 362-65 (when jurisdictional facts are inextricably intertwined with merits, court may defer resolution of jurisdictional issue until trial); *Kerns*, 585 F.3d at 193 (when jurisdictional facts are intertwined with merits, court should resolve factual dispute only after appropriate discovery); *United States v. North Carolina,* 180 F.3d 574, 580-81 (4th Cir. 1999) (in Title VII suit, merits and jurisdictional questions were so closely related that jurisdictional issues were not suited for resolution in context of motion to dismiss because establishing jurisdiction required proof of same matters that were required to prevail on merits); *accord Gentek Building Prods, Inc. v. Sherwin Williams Co*., 491 F.3d 320, 330 (6th Cir. 2007) (court may engage in factual inquiry only when facts necessary to sustain jurisdiction do not implicate merits; if attack on subject matter jurisdiction implicates an element of the cause of action, district court should find that jurisdiction exists and deal with objection as direct attack on merits of plaintiff's claim).

## ARGUMENT

### I. Petitioners' Citizenship, Status, and the Procedures Through which their Status Was Determined Still Weigh Heavily in Favor of Habeas Jurisdiction

#### A. Citizenship and Status

With regard to both citizenship and status, Petitioners were held to be indistinguishable from the *Boumediene* petitioners, who were constitutionally entitled to habeas review of their

detention. The Court of Appeals found that "[s]o far as citizenship is concerned, [the *Maqaleh* Petitioners] differ in no material respect from the petitioners at Guantánamo who prevailed in *Boumediene*." *Maqaleh*, 605 F.3d at 96. It therefore found that Petitioners' alien citizenship "did not weigh against their claim to protection of the right of habeas corpus." *Id*.

In its citizenship analysis, the Court of Appeals appears to rely on a binary distinction between U.S. citizens and noncitizens. *See Maqaleh*, 605 F.3d at 95-96. Petitioners, however, have consistently argued that the case law supports an additional distinction, which should be applied to citizens of countries who are not involved in any hostilities against the United States. *See Boumediene,* 553 U.S. at 734 (noting that no petitioner was a "citizen of a nation now at war with the United States"); *Rasul v. Bush*, 542 U.S. 466, 476 (2004) (noting that petitioners were "not nationals of countries at war with the United States"); *see also Johnson v. Eisentrager*, 339 U.S. 763, 769 n.2 (1950) (defining an alien enemy as "the subject of a foreign state at war with the United States"). Petitioners are citizens of Yemen and Tunisia and neither country is at war with the United States.

"As to status," the Court of Appeals stated, "the petitioners before us are held as enemy aliens. But so were the *Boumediene* petitioners." *Maqaleh*, 605 F.3d at 96. Thus, the Court of Appeals held that the status prong of the jurisdictional analysis weighed in Petitioners' favor. *See id*.

**B. The Detainee Review Board Procedures**

Respondents' own review procedures have already determined that Petitioners are eligible for release. Of course, Respondents cannot coherently maintain that this Court should pay heed to DRB findings that Petitioners are detainable, while asserting that DRB determinations of Petitioners' eligibility for release are irrelevant to this Court's jurisdictional

analysis. Even taking Respondents' assertions at face value, a DRB finding of eligibility for release amounts to an admission that Petitioners' "internment is no longer necessary." *See* Harward Decl. ¶ 12. That Respondents' DRB procedures have yielded findings that Petitioners are eligible for release therefore tips the status factor of the *Boumediene* analysis even more strongly in Petitioners' favor. This is especially true where the entire DRB scheme is so patently and deeply marked by unmitigated arbitrariness.

In assessing the weight that should be accorded Petitioners' new allegations regarding their status determination by the DRB, the Court should recall that the *Eisentrager* petitioners had been *convicted* after a criminal trial before that case reached the Supreme Court. The outcome of that case might have been quite different if the petitioners had been *acquitted* of the charges at trial, yet continued to be detained in U.S. military custody. A more arbitrary form of process cannot be imagined than a procedure in which the government seeks to rely on the determination it produces—but only in instances when the results are in favor of continued detention.

The Court of Appeals found that, with regard to adequacy of process, Petitioners "are in a stronger position for the availability of the writ than were either the *Eisentrager* or *Boumediene* petitioners." *Maqaleh*, 605 F.3d at 96. The Supreme Court had previously found that the Combatant Status Review Tribunal ("CSRT") afforded inadequate process to detainees at Guantánamo Bay to challenge their status and detention. *See Boumediene*, 553 U.S. at 767 (finding that "the procedural protections afforded to the detainees in the CSRT hearings are far more limited, and … fall well short of the procedures and adversarial mechanisms that would eliminate the need for habeas corpus review"). Applying the *Boumediene* analysis to the Unlawful Enemy Combatant Review Board ("UECRB"), the Court of Appeals agreed with this

Court's analysis and found that "proceedings before the UECRB afford even less protection to the rights of detainees in the determination of status than was the case with the CSRT." *Id.*; *Al Maqaleh*, 604 F. Supp. 2d at 227.

Since the Court of Appeals issued its initial ruling regarding jurisdiction in these cases,[4] Respondents have replaced their allegations about the UECRB procedures previously relied upon in their briefs with allegations about the DRB that are purportedly now in place. See Resp'ts' Mot. at 20-23. In their Motion, Respondents seem to suggest that the new DRB procedures obviate the need for judicial review of the legality of Petitioners' detention. But the DRBs do nothing to address the fundamental flaws of the UECRB procedures, which both this Court and the Court of Appeals previously held were inadequate. While it might be argued that recent modifications make the DRB slightly less defective than the UECRB, it is clear that the DRB falls short even of the deficient CSRT. Most glaringly, though Guantánamo detainees could seek review of CSRT decisions before a U.S. federal court under the Detainee Treatment Act ("DTA"), Petitioners cannot appeal their DRB status determinations to any higher authority, much less an Article III court. *See* Detainee Treatment Act of 2005 ("DTA"), 119 Stat. 2739. Thus, under the *Boumediene* analysis, the DRBs remain an inadequate process, and this factor of the test therefore continues to weigh heavily in favor of the Court's exercise of habeas jurisdiction.

***Lack of Access to Counsel***

The DRB, like its predecessor UECRB, denies Petitioners access to counsel.[5] The Court

[4] Though Respondents implemented the DRB procedures before the Court of Appeals' decision of May 21, 2010, the Court limited its review to the UECRB, as the evidence regarding the DRBs had not been introduced before this Court and consequently did not form part of the record on appeal. *See Maqaleh*, 605 F.3d at 97, n. 4.

[5] DRB recommendations are also unreliable, as they draw heavily on classified information that the detainee is not allowed to view, much less dispute. *See* Eviatar Decl. ¶¶ 14-16. The DRB also may rely on classified information may have been obtained through torture or other illegal means.

of Appeals explicitly mentioned the lack of counsel access in finding the UECRB inadequate. *See Maqaleh*, 605 F.3d at 96 (noting that the *Eisentrager* petitioners were "entitled to representation by counsel" but Guantánamo detainees were not (quoting *Boumediene*, 553 U.S. at 767)). Respondents do not contest that Petitioners are denied any access to counsel under the DRB process. Instead, they point out that Petitioners are now assigned "personal representatives," a meme that harks back to the CSRTs. Resp'ts' Mot. at 21.

Personal representatives are not attorneys, and are therefore not bound by attorney-client privilege or any duty of confidentiality, zealous advocacy, or loyalty to the detainee. Though personal representatives are charged with representing "the best interests" of the detainees, this cannot substitute for the duty of zealous advocacy to which attorneys are bound. Respondents attempt to make hay out of the non-disclosure policy applicable to personal representatives, but the policy simply cannot substitute for (and is not co-extensive with) an attorney's duty of confidentiality.[6]

The record supports the quite obvious conclusion that personal representatives are unable to provide detainees with the level of representation that could be offered by competent legal counsel. *See, e.g.*, Eviatar Decl. ¶ 11 ("Personal representatives introduced little or no evidence in the DRBs. […] They posed few questions, and the questions they did ask were not probing. […] A competent lawyer would have been able to advocate much more effectively on behalf of a detainee.").

[6] One of the exceptions to the non-disclosure policy is that personal representatives are "under an obligation to disclose detainee conduct that is fraudulent." Harward Decl., Ex. C at 4. Attorneys, by contrast, *may* reveal a client's fraudulent conduct, but are not obligated to do so. *See, e.g.*, ABA Model Rules of Professional Conduct, Rule 1.6 (b). Moreover, attorney-client communications regarding past events are not excluded from the attorney-client privilege. *See* D.E. Evins, *Attorney-client privilege as affected by its assertion as to communications, or transmission of evidence, relating to crime already committed*, 16 A.L.R.3d 1029 (2011) (communications to attorney are not excluded from attorney-client privilege by reason of their dealing with crime which occurred in the past).

From the detainees' perspective, the personal representative's dual status as commissioned military officer and facilitator of their proceedings before the DRB is confusing and ambiguous. Understandably, then, detainees do not fully trust personal representatives to advocate on their behalf. *See* Declaration of Daphne Eviatar ¶ 13 (dated June 21, 2011) (hereinafter "Eviatar Decl.") (Attachment 6 to Foster Decl.) (noting that several former detainees have expressed an unwillingness to confide in their personal representatives). This lack of trust precludes the establishment of a meaningful, even remotely attorney-client-like relationship. Of course, the greatest obstacle to establishing an attorney-client relationship for the detainee remains that the personal representative is not, in fact, an attorney at all.

That the personal representative is tasked with assisting the detainee with his DRB does not make that officer competent to provide legal counsel to the detainee, nor would it even be helpful for him to do so. Personal representatives have no legal training and might only have thirty days to prepare for a DRB proceeding. *See* Harward Decl., Ex. C at 4. This is an extremely limited time to prepare for Petitioners' proceedings, particularly since they have been detained for seven or more years and their lengthy ordeals involve events that took place outside Afghanistan. Moreover, since there are only 15 personal representatives at Bagram, each representative is responsible for more than 100 detainees.[7] Given the complexity of Petitioners' files, Respondents have not demonstrated that personal representatives have the capability or the resources to provide Petitioners with even competent assistance, let alone representation. Though personal representatives sometimes contact family members of detainees in Afghanistan to provide testimony or evidence at DRB hearings, undersigned counsel is not aware of any case

[7] *See* HUMAN RIGHTS FIRST, DETAINED AND DENIED IN AFGHANISTAN 3 (May 2011), *available at* http://www.humanrightsfirst.org/2011/05/10/new-report-improvements-to-u-s-detention-practices-in-afghanistan-necessary-to-protect-u-s-national-security/.

in which a personal representative has ever reached out to the family of a third country national held at Bagram. *See* Decl. of Tina M. Foster, dated June 23, 2011, at ¶ 27-29 (Attached hereto as Ex. 1) ("Foster Decl.").

Moreover, Respondents' current practices at Bagram undermine their stated objectives of providing detainees with assistance in preparing for their appearance before the DRBs. In only one instance has a Personal Representative ever reached out to habeas counsel in advance of a DRB. Even so, counsel was not permitted to have a privileged, unmonitored conversation with his client, to hear any of the classified evidence against him, or even to prepare his client for the proceedings. *See* Kassem Decl. ¶¶ 20-21. Counsel was also not privy to any hearsay evidence that the DRB may have considered, and if the DRB relied on statements reportedly made by his client, he did not know if the Personal Representative raised the very high likelihood that such statements were obtained as a result of torture or coercive interrogation. *Id*. ¶ 21.

Ambiguity and confusion over the military's review procedures and access to assistance have only been exacerbated by Respondents' use of imposters impersonating lawyers for purposes of interrogating detainees. This practice was once employed by interrogators at Guantánamo. *See* Memorandum in Support of Emergency Motion for Injunction, *Al-Odah v. United States*, Civ. No. 02-0828 (CKK) (D.D.C. July 1, 2008). It is currently being used at Bagram. *See* Declaration of Ahmed Ibrahim ¶ 3-6 (dated June 16, 2011) (Attachment 4 to Foster Decl.). Authorities at Bagram have also apparently led Petitioners to believe that undersigned counsel are able to meet with them at Bagram, leaving them to conclude that undersigned counsel have not made such efforts. *See* Declaration of Houssine Najar ¶ 9-10 (dated June 21, 2011) (Attachment 5 to Foster Decl.); Foster Decl. ¶¶ 35, 36, 40. Under such circumstances, it would be difficult enough for any detainee to trust his actual attorney, much less a non-lawyer

uniformed officer working for the military.

***No Avenue of Impartial Appeal***

A second crucial deficiency in the UECRB scheme—the inability of a detainee to appeal his status determination to a neutral decision-maker—remains unchanged under the DRB. The Supreme Court has recognized the importance of the right to appeal. Prior to the *Boumediene* decision, detainees held at Guantánamo Bay were able to seek review of their status determinations before the Court of Appeals. However, the Supreme Court found that even with this limited appeal provision, the CSRT scheme remained inadequate. *See Boumediene,* 553 U.S. at 767 ("[A]lthough the detainee can seek review of his status determination in the Court of Appeals, that review process cannot cure all defects in the earlier proceedings."). Unlike the CSRT and like its predecessor UECRB, the DRB scheme does not afford Petitioners any sort of independent review of their status determinations. Moreover, DRB panel members are not even attorneys—much less experienced Article III judges. This heightens the need for independent review by qualified judges outside the executive branch.

Respondents insist that their current detention policy is consistent with "our Constitutional system" and therefore "subject to checks and balances." Resp'ts' Mot. at 19. However, by refusing to allow Petitioners to appeal DRB decisions to a neutral decision-maker, Respondents retain unilateral, unchecked authority over Petitioners' status and detention. Thus, even if the DRB clears a detainee for release, there is no authority to compel Respondents to follow the DRB recommendation. *See* Harward Decl. ¶ 12 (stating that even if a detainee is cleared for release, he will not be released unless the Deputy Secretary of Defense or his designees approves the release). Indeed, there is nothing in this record reflecting any steps taken by Respondents towards effectuating the DRB recommendation that Petitioners be released. In

other words, there is no evidence that the DRB is anything more than window-dressing aimed at distracting this Court from its constitutional role.

Moreover, any detention policy can be revoked or superseded at any time by subsequent command policies issued by the Department of Defense or another executive authority. *See, e.g.*, Harward Decl., Ex. C at ¶ 2 (stating that the July 11, 2010 memorandum supersedes all previous command policies and guidances "pertaining to the review of individual detentions at the Detention Facility in Parwan"). Thus, any privileges that Petitioners might have under the DRB scheme cannot be enforced and can also be taken away at Respondents' exclusive discretion.

***No Meaningful Ability to Call Witnesses***

Respondents cite small modifications in the DRB procedures as "improvements"—but these do not amount to meaningful changes in the fundamentally flawed procedures in place *for these Petitioners*. Under the new DRB procedures, Petitioners are theoretically allowed to call witnesses to testify on their behalf, but only if "reasonably available." *See* Harward Decl. ¶ 10. Respondents do not elaborate upon this vague standard, but with regard to Petitioners, it appears to mean that they cannot call any witnesses to testify on their behalf.

Respondents claim that more than 1,792 witnesses were called to testify in-person and an additional 425 testified via telephone between March 2010 and May 2011. Resp'ts Mot. at 22. But independent human rights observers who have been permitted to observe select proceedings paint an entirely different picture of the new procedures. For example, of the seven DRB hearings that Human Rights First witnessed, not a single witness was presented by the government or by the defense.[8]

[8] See HUMAN RIGHTS FIRST, DETAINED AND DENIED IN AFGHANISTAN 10 (May 2011), *available at* http://www.humanrightsfirst.org/2011/05/10/new-report-improvements-to-u-s-detention-practices-in-afghanistan-necessary-to-protect-u-s-national-security/.

Moreover, the number of witnesses called before DRBs of Afghan nationals has no bearing on the process afforded Petitioners. Since Petitioners are third country nationals captured outside Afghanistan, the witnesses that they would call upon most likely do not live in Afghanistan and, presumably, are therefore not "reasonably available" to testify in-person. In addition, the telephones at the Bagram facilities cannot place calls to witnesses that reside outside the United States or Afghanistan. *See* Kassem Decl. ¶¶ 16-18. Since Petitioners have no significant ties to the United States and were apprehended outside of Afghanistan, it seems highly unlikely that the most relevant witnesses in their cases can be reached for testimony before their DRBs.

More broadly, the testimony that witnesses are allowed to provide is extremely limited. At Petitioner al-Bakri's most recent DRB proceeding, undersigned counsel was permitted to testify, but only for a few minutes and on subjects seemingly selected by the personal representative. *See* Kassem Decl. ¶¶ 14-15.

***Meaningless Determinations***

Finally, the DRB can make recommendations about the disposition of a detainee's case, but has no authority to enforce these recommendations. *See* Eviatar Decl. ¶ 17 ("The DRB does not have authority to order detainees released, or to insist on any other disposition."). As a result, third country nationals recommended for release remain detained at Bagram long after that recommendation. *See* "Statement of New Facts Now Before the Court", *supra*; Kassem Decl. ¶ 8; Eviatar Decl. ¶ 20 ("It appears that several non-Afghan detainees have been recommended for release from U.S. custody but nevertheless remain in U.S. custody for months after release has been approved.").

Indeed, when a researcher at Human Rights First visited Afghanistan in February 2011 and was allowed to observe DRB proceedings at the invitation of the U.S. government, she noted that other similarly-situated prisoners shared Petitioners' predicament. *See* Eviatar Decl. ¶ 4. Based on her findings, Daphne Eviatar wrote an article describing the case of Hamidullah Khan, a 16-year-old Pakistani boy who has been detained at Bagram since 2008.[9] This article included a link to the press release issued by Hamidullah's attorneys that formed the basis for her ultimate conclusion—that certain detainees may remain at Bagram despite being cleared for release by Respondents' procedures. *See id.* ¶ 24.

Respondents attempted to discredit the statements made in Ms. Eviatar's article by claiming that she confused Hamidullah's case with that of another Pakistani boy who had been cleared by a DRB, Jan Sher Khan. *See* Resp'ts. Mot. at 25. There is simply no basis for this allegation, particularly as Jan Sher Khan is not mentioned anywhere in Ms. Eviatar's article. Moreover, Respondents do not even address, much less dispute, Ms. Eviatar's assertion that Hamidullah Khan was cleared for release—the fact upon which she bases her conclusion that DRB determinations of eligibility for release do not necessarily end imprisonment.

## II. New Facts Revealed About Petitioners' Sites of Apprehension and Detention Militate Strongly in Favor of Habeas Jurisdiction

With regard to the site of apprehension analysis under *Boumediene*, Petitioners are all third country nationals who were captured outside Afghanistan, away from any battlefield, and rendered to Bagram to face prolonged, indefinite detention. Redha al-Najar, a Tunisian citizen, was seized from his house in Karachi, Pakistan in 2002. He was then "disappeared" for a year and a half—during which time he was imprisoned at one or more CIA secret prisons or "black sites"—before being transferred to U.S. military custody at Bagram. Amin al-Bakri, a Yemeni

[9] *See id.*, Ex. A (*Justice Remains Elusive for Many at U.S. Prison in Afghanistan*, HUFFINGTON POST, Feb. 13, 2011, *available at* http://www.huffingtonpost.com/daphne-eviatar/justice-remains-elusive-f_b_822669.html).

citizen, was seized in Bangkok, Thailand while he was on a business trip in December 2002. He, too, was held in CIA secret prisons before he was finally transferred to Bagram. Respondents have not contested any of these facts. *See* Resp'ts. Mot. at 4.

In contrast, Respondents have selectively chosen to dispute Petitioner al-Maqaleh's allegation that he was apprehended outside Afghanistan by placing evidence on the record asserting that he was captured in Zabul, Afghanistan. *See* Harward Decl. ¶ 14. Respondents have denied counsel any access to these Petitioners, including Mr. al-Maqaleh. Thus, it was not until after Mr. al-Maqaleh's original habeas corpus petition was filed in this Court, and Respondents alleged that he was captured in Afghanistan, that Petitioners' counsel happened to learn that Mr. al-Maqaleh was, in fact, transferred to Bagram from Abu Ghraib prison in Iraq. This factual allegation was then added to Mr. al-Maqaleh's Amended Petition.

Significantly, Respondents do not dispute the fact that Mr. al-Maqaleh was transferred to Bagram from Iraq, nor the fact that Mr. al-Maqaleh was held in CIA secret prisons prior to his arrival at Bagram. *See* Resp'ts. Mot. at 4. Respondents presumably chose not to disclose this crucial information (which bears directly on the Court's *Boumediene* analysis) because it was not helpful to their litigation position. Instead, they opted to convey to this Court other information that created the impression that Mr. al-Maqaleh was captured and detained entirely within Afghanistan. Petitioners have now discovered this is utterly false.

With respect to the site of detention prong, new evidence now in the record indicates (1) that Respondents' efforts to transfer Afghan detainees to the custody of the Afghan government do not apply to these Petitioners; (2) that in contrast to its treatment of Afghan detainees, Respondents will continue to detain Petitioners indefinitely; and (3) that Respondents initially

chose—and now continue—to detain Petitioners at Bagram, instead of at a site where jurisdiction clearly attached, in order to evade judicial review.[10]

According to Respondents, the gradual transfer of Afghan detainees to Afghan government custody strengthens their argument that the United States lacks *de facto* sovereignty over Bagram Air Base. *See* Resp'ts' Mot. at 10. This characterization both misstates relevant law and mischaracterizes the nature of Respondents' control over Bagram and over these Petitioners. The Court of Appeals rejected *de facto* sovereignty as a bright-line test to determine jurisdiction under *Boumediene,* referring to this view of the law as "extreme." *Maqaleh*, 605 F.3d at 94 ("The Court in *Boumediene* expressly repudiated the argument of the United States in that case to the effect 'that the *Eisentrager* Court adopted a formalistic, sovereignty-based test for determining the reach of the Suspension Clause.'" (quoting *Boumediene*, 128 S. Ct. at 2257)). Thus, this Court should not limit itself to narrow, technical questions of sovereignty, but should also take into account practical considerations such as "the degree of control the military asserted over the facility." *Id.* (quoting *Boumediene*, 128 S. Ct. at 2257).

The fact that Respondents have started to transfer only Afghan detainees to the custody of the Afghan government bolsters Petitioners' argument that Respondents have exclusive custody and control over third country nationals. Unlike Afghan detainees, Petitioners are not subject to diplomatic agreements between the United States and Afghanistan, such as the Accommodation and Consignment Agreement. *See* Harward Decl., Ex. A. Thus, arrangements to transfer Afghan detainees do not affect the objective "degree of control" that Respondents have over Petitioners at Bagram. The evidence indicates that Respondents will continue to maintain exclusive control over a portion of the Bagram facility that will house Petitioners and other third

[10] Petitioners' brief discusses evidence of evasion of judicial review in Part IV, *infra*. As the Court of Appeals recognized, this evidence is relevant to multiple Boumediene factors, and could even constitute an additional factor in the jurisdictional analysis. *See Maqaleh,* 605 F.3d. at 98-99.

country nationals.[11]

Newly available evidence suggests that Respondents intend to maintain indefinite control at Bagram over Petitioners and third country nationals, which bears directly on the site of detention analysis under *Boumediene*. In analyzing this factor, the Supreme Court distinguished Landsberg Prison, addressed in *Johnson v. Eisentrager*, 339 U.S. 763 (1950), from the U.S. Naval Station at Guantánamo by explaining that a "critical difference[]" was that "[u]nlike [the government's] present control over the naval station, the United States' control over the prison in Germany was neither absolute nor indefinite." *Boumediene*, 553 U.S. at 768. The Court then found that the indefinite nature of the government's control of the naval station at Guantánamo weighed in favor of extending the writ to detainees at Guantánamo.

Thus, the relevant inquiry is whether Respondents are exercising indefinite control over Petitioners at Bagram and not whether the government has demonstrated intent to remain there "permanently." This Court should therefore decline Respondents' invitation to treat the terms "permanent" and "indefinite" as synonyms. The *Boumediene* Court never used the term "permanent." Moreover, the Court repeatedly shunned rigid formalism in its jurisdictional analysis, focusing instead on the writ's functional, flexible nature. *See Boumediene*, 553 U.S. at 779-80 (observing that "common-law habeas corpus was, above all, an adaptable remedy" and noting that "[h]abeas is not 'a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose'") (citing *Jones v. Cunningham*, 371 U.S. 236, 243 (1963)).

---

[11] *See* Statement of General David Petraeus, U.S. Senate Committee on Armed Services, March 15, 2011, *available at* http://armed-services.senate.gov/testimony.cfm?wit_id=9991&id=5058 ("[W]hat we have is a process where we identify [non-Afghan detainees] to the department, which then has to determine in an interagency process, with consultation with Capitol Hill, I believe, again, can they be returned to their country of origin, or are they going to be retained [in U.S. custody at Bagram] as we sort out literally what to do with them?"); Julian Barnes, *U.S. Hopes to Share Prison with Afghanistan*, L.A. TIMES, June 9, 2010, *available at* http://articles.latimes.com/2010/jun/09/world/la-fg-bagram-20100609.

Respondents have shown no intention of ending these Petitioners' indefinite detention. On the contrary, their statements suggest that they will indefinitely maintain detention capacity for third country nationals such as Petitioners at Bagram. *See, e.g.,* Lietzau Decl. ¶ 10 ("U.S. forces may need to maintain some detention capacity in Afghanistan, pursuant to the law of war, as long as military operations continue."); Test. of Michèle Flournoy, Under Secretary of Defense for Policy, before the House Committee on Armed Services, Mar. 16, 2011 (stating explicitly that third country nationals and the separate facility in which they are housed will not be transferred to Afghan custody).

According to Mr. Lietzau's latest declaration, the U.S. government will provide an "additional detainee housing unit adjacent to the [Parwan Facility]" that "will enable U.S. forces to continue to conduct detention operations on a limited basis during the ongoing surge in military operations in Afghanistan *and pending the transfer of non-Afghan detainees to their home countries or to third countries*." *See* Lietzau Decl. ¶ 5 (emphasis added).

Whether, when and on what terms such transfers might be conducted remains within Respondents' exclusive discretion. *See* Lietzau Decl. ¶ 8 (stating that "the United States may seek" to transfer non-Afghan prisoners whose DRB indicates that their alleged "threat may be mitigated by some lawful means other than continued internment by U.S. forces."). Moreover, such transfers will only be carried out when Respondents are satisfied that the receiving governments "are willing to accept responsibility for ensuring …that the detainee will not continue to pose a threat to the United States and its allies." *Id.*

Mr. Lietzau further claimed that "U.S. Forces will eventually transition this additional detention capacity to the [Government of the Islamic Republic of Afghanistan], consistent with [a] conditions-based approach." Lietzau Decl. ¶ 5. Setting aside its explicitly conditional nature,

this eventual transition will take place at an unspecified date that is even later than the handover of the Parwan Facility. The additional facility that will house Petitioner and other non-Afghans is intended "to expedite transition of the DFIP to the [Afghan government]" by preserving a separate area of total and exclusive U.S. detention authority beyond the Parwan Facility. Lietzau Decl. at ¶ 5. The United States clearly intends to hold onto the additional facility—and Petitioner—beyond the handover of the Parwan Facility to Afghan control.

The fact that Respondents have labeled Petitioners as "Enduring Security Threats" is further evidence of Respondents' intent to detain them indefinitely without process. *See* Kassem Decl. ¶ 6, 24-25. This designation is baseless, conclusory and ambiguous. The criteria (if any) for determining whether a detainee is an "enduring security threat" are classified, Eviatar Decl. ¶ 19, but detainees who are so labeled appear to be among those the government wishes to retain in its custody indefinitely.[12]

**III. Respondents' Claims that "Practical Obstacles" Prevent Extension of the Writ to Petitioners Are Not Credible Given Recent Developments at Bagram**

As discussed above, after the Court of Appeals issued its opinion in these cases, Respondents began facilitating full-blown civilian trials of Afghan detainees at Bagram. Afghan civilian lawyers and witnesses, along with journalists and observers from all over the world have travelled to and from these proceedings on the Air Base without incident.[13] In addition to the Afghan trial proceedings, Respondents claim that 1,792 live witnesses have been called to testify

---

[12] *See* Julian E. Barnes, *U.S. Seeks Role in Afghan Jail*, WALL ST. J., Sept. 22, 2010, *available at* http://online.wsj.com/article/SB10001424052748703399404575505864255940020.html (attached as Exhibit 10) (quoting Admiral Harward as stating: "I anticipate having a subset of unilateral U.S. detention operations, including Pakistanis we can't repatriate and enduring security threats."); Alissa J. Rubin, *U.S. Backs Trial for Four Detainees in Afghanistan*, N.Y. TIMES, July 17, 2010, *available at* http://www.nytimes.com/2010/07/18/world/asia/18detention.html?_r=1&pagewanted=all (attached as Exhibit 11) (citing General Martins who identified a small group of "enduring security threats" whom he implied would be continuously deemed detainable).

[13] *See, e.g.*, Nick Schifrin and Aleem Agha, *First Trials Begin of Detainees Held in U.S. Prisons*, ABC NEWS, *available at* http://abcnews.go.com/International/Afghanistan/trials- insurgents-us-afghan-prisons/story?id=10859507.

*in-person* at DRBs, and an additional 425 witnesses testified telephonically. *See* Resp'ts Mot. at 22.

All of this has been accomplished despite Respondents' familiar refrain that the conflict in Afghanistan prevents facilitation of counsel access at Bagram. Given Respondents' facilitation of Afghan counsel access, witness appearances, family visits[14], observer presence, and hundreds of full-blown criminal trials on-site at Bagram, they simply can no longer credibly claim that adjudication of Petitioners' habeas cases by this Court poses any additional security concerns due to the prison's geographical location. This is especially true where Petitioners and other third country nationals like them who were captured outside of Afghanistan constitute but a small minority of the prison population at Bagram. *Cf. Al Maqaleh v. Gates*, 604 F. Supp. 2d 205, 229 (D.D.C. 2009) ("The number of detainees who might be entitled to habeas review also factors into the analysis of practical obstacles.").

Respondents have independently determined that facilitating increased civilian access to DRB proceedings at Bagram does not pose an unreasonable security risk. Thus, any practical obstacles posed by Bagram's physical location in a zone of military conflict can be overcome if Respondents so choose. That Respondents would prefer, as a matter of policy, not to have this Court review the legality of their decision to detain these particular Petitioners at Bagram is not a "practical obstacle" that bears on this Court's jurisdiction analysis under *Boumediene*.

Of course, "[c]ompliance with any judicial process requires some incremental expenditure of resources." *Boumediene*, 553 U.S. at 769. The Supreme Court in *Boumediene* recognized that there will be "costs to holding the Suspension Clause applicable in a case of military detention abroad," and acknowledged that such costs might include "the expenditure of

---

[14] *See* International Committee of the Red Cross, *Afghanistan: Family Visit Programme Begins for Bagram Detainees* (Sept. 23, 2008), *available at* http://www.icrc.org/eng/resources/documents/feature/afghanistan-feature-230908.htm.

funds by the Government and [the diversion of] the attention of military personnel from other pressing tasks." *Id*. But such practical obstacles were insufficient to justify suspension of the writ at Guantánamo, just as they are at Bagram.

**IV. New Evidence Suggests that Respondents Chose to Detain Petitioners at Bagram to Evade Judicial Review**

In *Boumediene*, the Supreme Court held that "[t]he test for determining the scope of [the Suspension Clause] must not be subject to manipulation by those whose power it is designed to restrain." *Boumediene,* 553 U.S. at 765-66. In a similar vein, the Court of Appeals stressed that it "[did] not ignore the arguments of the detainees that the United States chose the place of detention and might be able 'to evade judicial review […] by transferring detainees into active conflict zones.'" It noted "that the Supreme Court did not dictate that the three enumerated [*Boumediene*] factors are exhaustive. It only told us that 'at *least* three factors are relevant." *Maqaleh*, 605 F.3d at 98. The Court of Appeals expressly left open the possibility that evidence pointing to evasion of judicial review could affect the analysis of the second and third *Boumediene* factors and that "evasion" could even constitute an additional factor in the jurisdictional analysis. *See id.* at 98-99.

New information which only became available after the Court of Appeals considered the case evinces Respondents' manipulation to evade judicial review—a point which bears directly on the site of detention analysis. In August 2010, the Associated Press reported that Respondents had deliberately instituted a reverse flow from Guantánamo, moving prisoners to other detention sites specifically to avoid habeas jurisdiction.[15] Documents obtained on October

[15] *See* Matt Apuzzo and Adam Goldman, *CIA Flight Carried Secret from Gitmo*, ASSOC. PRESS, Aug. 6, 2010, *available at* http://www.google.com/hostednews/ap/article/ALeqM5hYo75CGJL898aYND1OJ1t91PSAJgD9HE62700 (recounting transfer of four prisoners from Guantánamo to Morocco several weeks before Supreme Court's decision in *Rasul* specifically to avoid potential habeas jurisdiction).

1, 2010 by the American Civil Liberties Union via litigation under the Freedom of Information Act corroborate news reports that Bagram was initially used as a transfer station to Guantánamo for interrogation purposes but later became the end point when judicial review over Guantánamo was established.[16] As of February 2004—before *Rasul* or *Hamdi*—the government transferred detainees from Bagram to Guantánamo because their "exploitation require[d] the specialized capabilities available at Guantánamo."[17] By May 13, 2009 the government had amended that policy, noting that the "linkage between BTIF and GTMO had been severed over time," such that "[s]tatus determinations and threat assessments [are] *no longer* tied to GTMO transfer criteria."[18]

Petitioners also recently discovered that at least thirty-six detainees were moved from Guantánamo to Afghanistan between 2007 and 2009. These detainees were sent either to the Bagram, or else to the Afghan National Detention Facility ("ANDF"), which is operated by the Afghan government. Respondents deny that any of these detainees were sent to Bagram. Resp'ts Mot. at 15.

Petitioners have been effectively chilled from discussing the contents of certain documents, which prove the contrary, due to a Guidance Document recently promulgated by the

---

[16] Among other things, these documents reveal that the original Bagram UECRB procedures to review detainees' status *primarily* to identify those detainees who would be transferred to Guantanamo, *see* DEPARTMENT OF DEFENSE OUSD(P)/OFFICE OF DETAINEE POLICY, Bagram Theater Internment Facility (BTIF) Policy Review, (Apr. 22, 2009), at Bagram-Policy 3 (stating that "Detainee review procedures at the BTIF (UECRBS) were originally established to support GTMO transfer decisions," that "[r]eview processes originated in 2002-2004 timeframe," and that "High-level/Low-level Enemy Combatant Status [was] tied to GTMO transfer criteria"), because their "exploitation require[d] the specialized capabilities available at Guantanamo," Thomas W. O'Connell, Assistant Secretary of Defense, Action Memorandum to Deputy Secretary of Defense, (Feb. 20, 2004), at 2-3 (Attachment 3 to the Foster Declaration).

[17] Action Memorandum from Thomas W. O'Connell, Assistant Secretary of Defense, to Deputy Secretary of Defense (Feb. 20, 2004) at 2-3, available at http://www.aclu.org/national-security/bagram-foia-dod-and-doj-documents-released-692010 (Attachment 1 to Foster Declaration).

[18] Dep't of Defense Office of Detainee Policy, Proposed Revisions to Detainee Review Procedures in Afghanistan (May 13, 2009) at 2, available athttp://www.aclu.org/files/pdfs/natsec/bagram20100514/03bagrampolicy_9-13_20090513.pdf (Attachment 2 to Foster Declaration) (emphasis added).

U.S. government. On June 6, 2011, the Court Security Office ("CSO") of the Department of Justice issued a "Guidance re Wikileaks" cautioning habeas counsel in their use and dissemination of classified information from the Wikileaks website. *See* CSO Guidance Re Wikileaks (June 6, 2011) (hereinafter "Wikileaks Guidance"). Petitioners maintain that the Wikileaks Guidance is deeply flawed, and contrary to law in a number of significant respects. *See Paracha v. Obama*, No. 04-CV-2204 (PLF) (D.D.C. Apr. 27, 2011) ("Emergency Application for Immediate Access to All Publicly Available Wikileaks Documents…") (criticizing the earlier version of the CSO Wikileaks Guidance for limiting counsel's access to Wikileaks documents and his ability to respond to public allegations against his client).

Petitioners do not concede that the Wikileaks Guidance is a valid exercise of the government's authority. Nevertheless, Petitioners have refrained from attaching or summarizing the relevant documents, in accordance with the Guidance. *See* Wikileaks Guidance at 2 (stating that when making discovery requests, counsel may reference but "must not discuss the contents of the requested document(s)."). As of today, June 23, 2011, the following Wikileaks documents are available online and directly contradict Respondents' representations that there were no transfers of detainees from Guantánamo to Bagram:

- (Friendly Action) Detainee Transfer RPT: 0 INJ/DAM - Kabul War Diary, Reference ID AFG20080727n1372, *available at* http://jadedoto.net/afg/event/2008/07/AFG20080727n1372.html (last visited June 23, 2011);

- (Friendly Action) Detainee Transfer RPT: 0 INJ/DAM – Kabul War Diary, Reference ID AFG20090118n1665, *available at* http://www.afg-war-diary.tk/afg/event/2009/01/AFG20090118n1665.html (last visited June 23, 2011).

It is telling that Respondents offer nothing to counter Petitioners' allegation, other than counsel's unsupported claim that Petitioners are incorrect. They provide no contrary

information, nor deny the allegation with an affidavit from an official with knowledge of the transfer decisions.

Similarly, if Respondents transferred Petitioners to Bagram for reasons independent of manipulating the site of detention for jurisdictional purposes, they have not shared those reasons with the Court. *See* Resp'ts' Mot. at 14 (stating that decisions to transfer detainees "may be" based on other considerations, but failing to specify what those considerations might be). Respondents also do not deny that Petitioners were transferred to Bagram, rather than another site where jurisdiction would have clearly attached, in order to avoid judicial review. And, Respondents do not deny that they have since kept Petitioners at Bagram for years, rather than at other sites where jurisdiction attaches—including Guantánamo—in order to evade judicial review.

More broadly, as this Court recognized, the fact that Petitioners are third country nationals that were captured outside Afghanistan and rendered to Bagram, in itself raises "the specter of limitless Executive power the Supreme Court sought to guard against in *Boumediene*—the concern that the Executive could move detainees physically beyond the reach of the Constitution and detain them indefinitely." *Al Maqaleh*, 604 F. Supp at 220. Thus, Respondents need not have anticipated the complex litigation history and resulting Supreme Court decisions to have engaged in the sort of manipulation alleged by Petitioners, which is barred by *Boumediene* and the Constitution. It is enough that the entire premise of the U.S. rendition program that took Petitioners from third countries to Bagram in Afghanistan was to shield Respondents' detention and interrogation policies and practices from judicial scrutiny.

From its inception, Bagram was a "collection site" for Guantánamo,[19] where detainees

[19] *See* Memorandum to the U.S. Deputy Sec'y of State, from Gregory Suchan, Acting Asst. Sec'y for Political-Military Affairs, "Information Memorandum re: Nationalities at Bagram," Jan. 24, 2002, *available at*

faced further interrogation and indefinite detention; both locations were selected due to their perceived insulation from judicial scrutiny relative to other candidate sites, including ones in the territorial United States. The Executive only began using Guantánamo as a detention site after receiving reassurance from the Office of Legal Counsel that habeas jurisdiction was unlikely to reach Guantánamo.[20] Bagram fits neatly into that calculation. Indeed, the very heart of the Bagram/Guantánamo strategy was to take people *away from* rather than *to* justice, sharply deviating from settled law and practice.[21]

Habeas jurisdiction over the Guantánamo detainees grew increasingly contested as of February 2002. *See, e.g.*, *Rasul v. Bush*, 215 F. Supp. 2d 55, 68-72 (D.D.C. 2002) (inquiring into jurisdiction over cases filed by detainees held at Guantánamo). From 2004 to 2006, habeas review seemed likely. *Rasul*, 542 U.S. at 480-82; *Hamdan*, 548 U.S. at 572-84. Not coincidentally, the detainee population at Bagram increased dramatically during that same period.[22] At the same time, the number of transfers from Bagram to Guantánamo dropped significantly. This was attributable "in part [to] a Bush administration decision to shut off the flow of detainees into Guantánamo after the Supreme Court ruled that those prisoners had some basic due-process rights."[23] Respondents have not revealed when or how they made the decision

---

www.aclu.org/torturefoia/released/t2677_2679.pdf (describing Bagram Prison as a "collection center" for detainees awaiting transfer to Guantánamo ).

[20] *See* Memorandum to the General Counsel, Dept. of Defense, from Patrick F. Philbin & John C. Yoo, Deputy Asst. Attorneys General, "Possible Habeas Jurisdiction over Aliens Held in Guantánamo Bay, Cuba," Dec. 28, 2001, *available at* www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB127/01.12.28.pdf; *see also Hamad v. Bush*, Case No. 05-cv-1009 (D.D.C.), Decl. of Colonel Lawrence B. Wilkerson, at ¶9c, *available at* www.truth-out.org/files/Wilkerson.pdf (noting that "the deliberate choice to send detainees to Guantánamo was an attempt to place them outside the jurisdiction of the U.S. legal system").

[21] *See, e.g.*, Margaret Satterthwaite & Angelina Fisher, *Tortured Logic: Renditions to Justice, Extraordinary Rendition, and Human Rights Law*, 6 THE LONG TERM VIEW 46, 49-52 (2006) (contrasting Reagan-era rendition program with post-9/11 program).

[22] Tim Golden, *Foiling U.S. Plan, Prison Expands in Afghanistan*, N.Y. Times, Jan. 7, 2008, *available at* www.nytimes.com/2008/01/07/world/asia/07bagram.html (noting that Bagram population was about 100 detainees in early 2004, but increased to more than 500 by 2007).

[23] Tim Golden & Eric Schmitt, *A Growing Afghan Prison Rivals Bleak Guantánamo* , N.Y. Times, Feb. 26, 2006, *available at* www.nytimes.com/2006/02/26/international/26bagram.html.

to transfer Petitioners to Bagram. Nevertheless, it appears that, as a matter of policy, Respondents wanted full custody over Petitioners but chose from the outset not to house Petitioners in sites in the territorial United States where habeas jurisdiction was more certain to attach. It seems equally apparent that, unlike a great many Bagram prisoners, Petitioners were not transferred to Guantanamo once the prospect of judicial review there became increasingly likely. The detention policies that dictated Petitioners' fates throughout their lengthy ordeals appear to have been consistently shaped with an eye towards evading this Court's jurisdiction and its review.

**V. Petitioners are Entitled to Take Jurisdictional Discovery**

Where, as here, Respondents assert extrinsic facts claiming they are relevant to a determination of subject matter jurisdiction, the Court must permit Petitioners to take discovery with regard to those facts prior to granting a motion to dismiss. *See e.g.*, *Loughlin v. United States*, 393 F.3d 155, 166-68, 172 (D.C. Cir. 2004); *Ignatiev v. United States*, 238 F.3d 464, 467 (D.C. Cir. 2001). The Court is not at liberty to convert a motion to dismiss for want of jurisdiction into a summary judgment proceeding through consideration of matters outside the pleadings without first providing a fair opportunity for all parties to discover and proffer evidence in the converted proceeding. *See Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987).

In *Ignatiev*, the D.C. Circuit Court of Appeals reversed a dismissal for lack of subject matter jurisdiction on facts analogous to those in this case. There, Federal Tort Claims Act ("FTCA") claimants alleged that the Secret Service "likely had internal objectives or policies that created the requisite mandatory obligation" to take certain safety precautions, which the claimants alleged had not been taken. 238 F.3d at 466**.** The Court of Appeals held that the trial

court erred in not permitting discovery regarding the existence of such directives, noting that "the only discovery necessary to establish jurisdiction pertains . . . to the existence *vel non* of internal governmental policies […]." *Id*. at 467**.**

The decision in *Ignatiev* is now the rule of the Circuit: where facts are necessary to establish jurisdiction, a party must be given "ample opportunity" to obtain and present evidence before a court may grant the opposing party's motion to dismiss for lack of subject matter jurisdiction. *See, e.g., Sledge v. United States,* 723 F. Supp. 2d 87, 103 (D.D.C. 2010) (ordering limited discovery regarding existence of mandatory directives and whether federal employees violated such directives to determine whether exception applies to plaintiffs' FTCA claims); *Singh v. S. Asian Soc'y of the George Washington Univ*., 572 F. Supp. 2d 11, 13 (D.D.C. 2008) (stating that the Court previously permitted discovery to determine "whether there was a mandatory policy regarding the placement of security guards at the exits of the Old Post Office Pavilion"); *Loughlin v. United States,* 286 F. Supp. 2d 1, 3 (D.D.C. 2003) (explaining that court previously reserved judgment on government's discretionary function argument and "gave the claimants an opportunity to conduct discovery regarding the existence of rules, regulations, or directives that might bear on whether the exception applies here"), *aff'd*, 393 F.3d at 166-68, 172 (finding that district court erred in suggesting that jurisdictional discovery is limited to first prong of discretionary function exception test, but concluding that court's discovery orders afforded parties sufficient opportunity to pursue relevant information).

In their Motion, Respondents have offered vague or nonresponsive answers to Petitioners' allegations regarding, for example, Petitioners' rendition to Bagram and prior sites of detention. *See, e.g.*, Resp'ts Mot. at 14 ("[Decisions to transfer detainees from GITMO to Bagram] *may be* based on considerations that have nothing to do with any intent to avoid judicial

review.") (emphasis added); at 8 (stating that Petitioners' allegations of Respondents' intent to maintain an indefinite presence at Bagram "has no factual basis" and that Petitioners "did not provide a specific duration for such proposed control."). Because "respondents have chosen not to engage petitioners" on certain of their factual allegations, and those allegations concern jurisdictional facts within Respondents' exclusively knowledge and control, the burden of proof cannot fall on Petitioners to establish these facts absent jurisdictional discovery. *See Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 64 (D.D.C. 2004) (stating that Court should consider Petitioners' evidence "in light of the unavailability of" Petitioners themselves and the fact that "the location of most of the remainder of the information regarding [Petitioners'] detention is in the hands of the United States or [other] governments"); *see also Campbell v. United States*, 365 U.S. 85, 96 (1961) (stating that burden of proof cannot be placed "upon a litigant of establishing facts peculiarly within the knowledge of his adversary").

As this Court has recognized, there are facts exclusively within Respondents' peculiar knowledge which are relevant to the jurisdictional analysis. *See Al-Maqaleh v. Gates*, No. 06-1669 (JDB) (D.D.C. Jan. 7, 2009) (Order Directing Respondents to File Additional Information) (the Court later ordered Respondents to file updated information on March 2, 2009). This Court has the authority to balance the parties' conflicting interests and order appropriate jurisdictional discovery, even in instances where the government maintains that such discovery would "involve the courts in matters of the most delicate diplomacy." *Abu Ali*, 350 F. Supp 2d at 64. For example, if the Court wishes to review further evidence prior to ruling on manipulation, it could order Respondents to produce any documentary evidence in the detainees' files or elsewhere clarifying their sites of apprehension, sites of detention, and any transfer orders or policy memoranda reflecting the rationale for moving Petitioners between facilities. At a minimum,

this Court should permit undersigned counsel to meet or at least confer remotely with their clients at Bagram so that they can inform their attorneys of any additional facts relevant to this Court's jurisdictional analysis—Respondents should not be able to gain a litigation advantage over Petitioners by preventing any and all forms of attorney-client communication.

Such limited discovery would impose little additional burden on Respondents. Indeed, without having been ordered to do so, Respondents have voluntarily submitted no less than 13 declarations by military personnel and government officials since these cases were originally filed. *See, e.g.,* Decl. of Colonel James Gray, dated March 5, 2007, *Maqaleh v. Gates*, 06-CV-01669 (JDB) (stating that U.S. military unit "Task Force Guardian is responsible for operating Bagram Theater Internment Facility (BTIF), a Department of Defense (DoD) detention facility located at the Bagram Airfield," reciting enemy combatant status determination process, and noting that "a significant percentage of the Afghan detainees at the BTIF is expected to be transferred to the Government of Afghanistan" within one year); Second Decl. of Colonel Gray, dated April 20, 2007, *Maqaleh v. Gates*, 06-CV-01669 (JDB) (attaching memoranda describing the CSRT and ARB procedures in effect at Guantanamo and the different Detainee Status Determination Procedures in effect in Afghanistan); Decl. of Clint Williamson, dated November 5, 2008, *Maqaleh v. Gates*, 06-CV-01669 (JDB) (explaining State Department's role in identifying countries that might accept released Guantanamo detainees); Decl. of Colonel Joe Ethridge, dated January 16, 2009, *Maqaleh v. Gates*, 06-CV-01669 (JDB) (responding to the Court's order to provide information regarding the number of detainees held at Bagram, the number who are Afghan citizens, and the number who were captured outside Afghanistan); Decl. of Curtis M. Scaparrotti, dated December 30, 2009, *Maqaleh v. Gates*, 06-CV-01669 (JDB) (discussing the need for the new prison facility at Bagram and the planned demolition of Bagram

prison). In addition, there are presently no obstacles to facilitating some form of counsel access at Bagram—except Respondents' arbitrary desire to prevent Petitioners from communicating with their lawyers. Respondents' own actions demonstrate that limited jurisdictional discovery would impose no additional burden of significance beyond that which Respondents have already undertaken when they have deemed it advantageous to their litigation position or policy objectives.

Petitioners do not believe that such jurisdictional discovery is necessary, as they have already presented sufficient evidence and allegations in support of the Court's exercise of habeas jurisdiction to warrant denial of Respondents' Motion to Dismiss. However, should the Court disagree, it should not dismiss the Amended Petitions without first granting Petitioners' limited discovery request.

## CONCLUSION

For the foregoing reasons, this Court should deny Respondents' Motion to Dismiss the Amended Petitions for Writ of Habeas Corpus.

Dated: June 23, 2011

Respectfully submitted,

____/s/_________________
Ramzi Kassem
**Main Street Legal Services, Inc.**
**City University of New York**
**School of Law**
65-21 Main Street
Flushing, NY 11367
(718) 340-4558

Hope R. Metcalf
**Lowenstein Int'l Human Rights Clinic**
**Yale Law School**
127 Wall Street
New Haven, CT 06511
(203) 432-0138

*Lead Counsel for Petitioner Amin al-Bakri*

____/s/_________________
Tina Monshipour Foster
Barbara J. Olshansky
Reyhan Abeyratne*
**International Justice Network**
P.O. Box 610119
New York, NY 11361
(650) 388-2237

*Counsel for Petitioners Fadi al-Maqaleh, Redha al-Najar, and Amin al-Bakri*

* law clerk, not yet admitted to practice