# Declaration of Tina M. Foster
# (dated June 23, 2011)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FADI AL-MAQALEH,** ***et al.*****,**<br>**Petitioners,**<br>**v.**<br>**BARACK H. OBAMA,** ***et al.*****,**<br>**Respondents.** | **Civil Action No. 06-1669 (JDB)** |
| **AMIN AL-BAKRI,** ***et al.*****,**<br>**Petitioners,**<br>**v.**<br>**BARACK H. OBAMA,** ***et al.*****,**<br>**Respondents.** | **Civil Action No. 08-1307 (JDB)** |
| **REDHA AL-NAJAR,** ***et al.*****,**<br>**Petitioners,**<br>**v.**<br>**BARACK H. OBAMA,** ***et al.*****,**<br>**Respondents.** | **Civil Action No. 08-2143 (JDB)** |

**DECLARATION OF TINA M. FOSTER**

Pursuant to 28 U.S.C. § 1746, I certify that the following is true and correct to the best of my knowledge:

1. I am an attorney admitted to practice law in the States of New York and Massachusetts, and represent Petitioners in the above-captioned matter. I present this declaration in support of Petitioners' Opposition to Respondents' Motion to Dismiss Amended Petitions for Lack of Subject Matter Jurisdiction, filed herewith.

2. I am the Executive Director of the International Justice Network. The International Justice Network ("IJN") is a 501(c)3 non-profit organization that provides legal assistance to survivors of human rights abuses and their families.

3. From June 2004 through April 2006, I worked at the Center for Constitutional Rights, were I was a co-founder of the Guantanamo Global Justice Initiative.

4. While at the Center, I was the attorney with primarily responsibility for identifying, locating, and obtaining "Next Friend" authorizations from family members of Guantanamo detainees.

5. The government refused to provide counsel access to the detainees without these authorizations, and maintained that even the identities of who was detained at Guantanamo was classified information. Thus, it was necessary to obtain a Next Friend authorization in order to initiate the filing of a Petition for Writ of Habeas Corpus on behalf of each detainee.

6. While working on the Guantanamo habeas cases, I traveled to Yemen, Afghanistan, and other countries in order to locate detainees' families. With assistance from local human rights organizations, I was able to find families who had been informed via the International Committee of the Red Cross (ICRC) that their son (or another member of the family) was being detained in U.S. military custody.

7. During my time working on the Guantanamo cases, I interviewed hundreds of detainees' family members.

8. In many instances, I was not able to assist families with filing habeas cases because they knew little more than the fact that their relative was being detained by the United States government *somewhere*, but did not know in which facility.

9. In cases where the family was fortunate enough to receive a hand-written letter from the detainee himself via the ICRC, these letters did not arrive until anywhere between 6 months and 2 years after they were written. Sadly, oftentimes the families had already assumed that their relative was dead by the time they received their first notification from the ICRC that he was being detained in U.S. custody.

10. What little information was left unredacted in ICRC letters received by the families was therefore already very old. The discernable content of these letters generally provide little insight into the circumstances of how, when, why or where the detainee was being held by the U.S. government.

11. In some instances, markings on the letters received by the families revealed the prison facility in which the detainee was being held – for example "GTMO" (indicating Guantanamo Bay Cuba) and "BTIF" (indicating Bagram Theater Internment Facility).

12. In other cases, any indication or information about whether the detainee was housed at Guantanamo, Bagram, or another facility, had been redacted from all correspondence that the family had received from the detainee.

13. In January 2005, I was contacted by several Afghan legal aid organizations that were being bombarded with requests from families of Bagram detainees seeking justice on behalf of their relatives.

14. Though the Center was already actively working with these organizations to recruit *pro bono* counsel for families of detainees held at Guantanamo, there was no organization providing similar assistance to the families of individuals who had been indefinitely detained by the U.S. government at Bagram.

15. Even after I resigned from the Center in April 2006, I continued to receive requests from Afghan, Yemeni and other human rights advocates from across the globe asking for information and assistance about where to refer families of detainees who were believed to be in U.S. military custody at Bagram.

16. Attorneys who had been involved in the early efforts to bring justice to Guantanamo recognized that in the wake of the Supreme Court's opinions extending the Writ to Guantanamo, the government had essentially stopped transferring detainees to that prison.

17. Recently, documents obtained through FOIA shed light on why this shift occurred.

18. Attachment 1 to this declaration is a 2004 "Action Memorandum from Thomas W. O'Connell, Assistant Secretary of Defense, to Deputy Secretary of Defense" produced by the government in FOIA litigation, *ACLU v. Dep't. of Defense*, No. 09-8071 (BSJ) (FM) (D.D.C. Aug. 2, 2010) (hereinafter "ACLU Bagram FOIA Litigation"), and available at http://www.aclu.org/national-security/bagram-foia-dod-and-doj-documents-released-692010.

19. Attachment 2 to this declaration is a document entitled "Dep't of Defense Office of Detainee Policy, Proposed Revisions to Detainee Review Procedures in Afghanistan" dated May 13, 2009, also produced by the government in the ACLU Bagram FOIA Litigation, and available at http://www.aclu.org/files/pdfs/natsec/bagram20100514/03bagrampolicy_9-13_20090513.pdf.

20. Attachment 3 to this declaration is a series of excerpts from Bagram policy documents produced by the government in the ACLU Bagram FOIA Litigation and available at http://www.aclu.org/national-security/bagram-documents-released-5142010.

21. In 2006, a group of attorneys who had provided *pro bono* legal representation to Guantanamo detainees formed the International Justice Network in order to address the unmet need for additional legal assistance to help people indefinitely detained without charge in legal black holes beyond Guantanamo.

22. Since IJN's founding in 2006, it has provided legal assistance to more than 40 families of Bagram detainees. Only a small fraction of these families ultimately filed Next Friend habeas petitions in this Court.

23. IJN filed the first Bagram habeas petition on behalf of Mr. Al-Maqaleh in September 2006, and has continued to provide representation to Bagram detainees with the assistance of co-counsel. IJN also coordinates the litigation and advocacy efforts on behalf other individuals detained at Bagram.

24. In the course of my work, I routinely travel to Afghanistan, and have had no trouble arranging meeting with prisoners held by Afghan authorities – so long as they are held at purely Afghan-run detention facilities.

25. In contrast, I have never been allowed to meet with any of my clients at Bagram.

26. Nevertheless, some prisoners' families have contacted me after learning my name and how to reach me directly from their relative who is detained at Bagram. Thus, it appears that some detainees at Bagram have been made aware of the fact that there is an attorney with my name who is representing Bagram prisoners.

27. Afghan detainees' families are often familiar with prison procedures and aware of the DRB process, as many of them have personally visited their relatives at Bagram.

28. In some instances, relatives of detainees have been contacted by personal representatives at Bagram in preparation for an upcoming DRB. In all such instances, the detainee was an Afghan national, and the relative who was contacted also resided in Afghanistan.

29. As far as I am aware, no members of Petitioners' families have ever been contacted by a personal representative or other personnel associated with a DRB at Bagram.

30. In one of IJN's cases currently pending before Judge Henry Kennedy, I am lead counsel representing a Pakistani man named Amanatullah Ali. As part of my work on Mr. Amanatullah's case and the cases of several other Pakistani citizens, I often travel to Pakistan in order to meet with my clients and human rights advocates there.

31. I was recently contacted by an advocate from Islamabad, Pakistan, Ms. Sultana Noon. Ms. Noon works for the legal charity Reprieve.

32. I was shocked and deeply troubled to learn from Ms. Noon that one of her Pakistani clients who is detained at Bagram, Yunus Rahmatullah (or 'Salah" as he is known by his family) was apparently visited by an individual at Bagram who claimed to be me – and identified herself to the detainee by my name.

33. The details of this incident are provided in the sworn declaration of Salah's cousin, Ahmed Ibrahim, attached hereto as Attachment 4.

34. I was not surprised to hear that interrogators at Bagram had posed as lawyers, as this had been reported by detainees prior to the establishment of routine counsel access at Guantanamo. However, I am outraged that the government has gone even so far as to employ an imposter at Bagram claiming to be me personally.

35. Because the government will not let me communicate with my clients at Bagram, I have no way of determining what the impact of these lies has been on my reputation among them.

36. Indeed, misinformation recently provided Petitioners in this case had left them to conclude that undersigned counsel is able to visit them at Bagram, but has chosen not to.

37. Attachment 5 to this declaration is a true and correct copy of the sworn statement of my client, Houssine Al-Najar, Next Friend to Petitioner Redha Al-Najar, executed on June 21, 2011.

38. In light of the confusion at Bagram, it is not difficult to understand why detainees and their families are distrustful of prison authorities, and put little stock in the procedures put in place to determine their status. This phenomenon has been investigated, researched, and witnessed by observers who were invited to watch detainee review board proceedings.

39. Attachment 6 to this declaration is a true and correct copy of the sworn declaration of Daphne Eviatar, a researcher at Human Rights Watch, executed on June 21, 2011.

40. My client, Next Friend Petitioner Ahmed Ali al-Maqaleh, also wished to submit a declaration to inform the Court about what he has learned regarding his son Fadi's DRB, and Fadi's apparent confusion regarding counsel access. Unfortunately, Mr. al-Maqaleh, who resides in Sana'a, Yemen, was unable to execute and deliver his declaration due to current difficulties in sending and receiving overseas communications from Yemen.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

New York, NY

Executed on this 23rd day of June, 2011

____/s/________________
TINA M. FOSTER

# ATTACHMENT 1

**to Declaration of Tina M. Foster**
**(dated June 23, 2011)**

~~SECRET/NOFORN~~ EF-5620

DSD, SDR - FOR SIGNATURE

ACTION MEMO

USD(P) I-03/000504

FOR: Deputy SECRETARY OF DEFENSE DepSecDef Action____

FROM: Thomas W. O'Connell, Assistant Secretary of Defense (SO/LIC)

SUBJECT: Global Screening Criteria for Detainees (U)

- ~~(S/NF)~~ Currently, we don't have guidance for all Combatant Commanders on screening and processing individuals detained in the war on terrorism.
  - ~~(S/NF)~~ Current policy addresses solely those enemy combatants detained in Operation Enduring Freedom in Afghanistan (Tab A).
- ~~(S/NF)~~ The attached guidance (Tab B) broadens extant policy to cover enemy combatants regardless of where they are captured.
  - ~~(S/NF)~~ The screening criteria apply to all terrorists whom the President has so designated because they pose a threat to the United States or US interests, or are of strategic intelligence or law enforcement value to the United States.
- ~~(S)~~ Per our previous discussions, this guidance makes clear that "low-level" enemy combatants who represent only a tactical force protection threat are not eligible for movement to Guantanamo Bay.
- ~~(S/NF)~~ The Annex at Tab C provides supplemental guidance to Commander, US Central Command, for screening and processing individuals detained in Afghanistan.

RECOMMENDATION: Approve the attached guidance at Tab B and Annex at Tab C.

Approve PW 2/20/04 Disapprove________ Other________

COORDINATION: TAB D

Attachments:
As stated.

Prepared by: (b)(2),(b)(6) Detainee Policy Group, (b)(2),(b)

Classified by: Mr. Thomas W. O'Connell, ASD SO/LIC
Reasons: 1.5 (a) and (d)
Declassify on: August 25, 2013

~~SECRET/NOFORN~~ X03287 /03

~~SECRET~~

**Criteria and Guidelines for Screening and Processing Persons Detained by the Department of Defense in Connection with the War on Terrorism**

## I. REFERENCES

(A) (U) President's Military Order -- *Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism*, November 13, 2001.

(B) (U) "*Humane Treatment of al Qaeda and Taliban detainees*," Memorandum from the President, February 7, 2002.

(C) ~~(S)~~ SECDEF-APPROVED CJCS EXORD (*Execute Order establishing Joint Task Force Guantanamo Bay (JTF-GTMO)*, Chairman, Joint Chiefs of Staff, Washington, DC, 202335Z AUG 02.

(D) ~~(S)~~ *Implementing Guidance on Detainee Screening and Processing for Transfers of Detainees in Afghanistan, to Guantanamo Bay Naval Station*, Secretary of Defense, January 7, 2002 (rev. December 10, 2002).

(E) (U) *Comprehensive List of Terrorists and Terrorist Groups Identified Under Executive Order 13224* (updates at http://www.treas.gov/ofac/).

(F) ~~(S//NF)~~ "*Low Level Enemy Combatants*," Memorandum from the Secretary of Defense, April 21, 2003.

(G) (U) *Patterns of Global Terrorism*, Department of State, 2002 (updates at http://www.state.gov/s/ct/rls/pgtrpt/).

## II. PURPOSE

~~(FOUO)~~ To provide criteria and guidelines for screening and processing individuals captured or taken under Department of Defense (DoD) control during Operation Enduring Freedom or other war-on-terrorism operations in accordance with references (A) (B) (C) (E) (F) and (G).

~~SECRET~~

Classified by: Thomas W. O'Connell, ASD SO/LIC
Reasons: 1.5(a) and (d)
Declassify on: August 25, 2013

22 August 2003

## III. POLICY

(a) (U) The United States is engaged in an armed conflict with al Qaeda, its supporters, and other designated terrorist organizations that have targeted the United States and its interests. This is an armed conflict against terrorist organizations of global reach and is not confined to one geographic area or one theater of operations.

(b) (U) It is the policy of the DoD to ensure that any individuals detained in war-on-terrorism operations and assessed to be Enemy Combatants are screened to ensure that they meet approved criteria for detention by the DoD.

(c) ~~(S)~~ Combatant Commanders performing war-on-terrorism missions shall screen individuals over whom they obtain control to determine whether they are Enemy Combatants and whether detention at Guantanamo Bay, Cuba, is warranted. Upon approval by the Secretary of Defense in applicable execute orders, Combatant Commanders may transfer to a DoD-approved facility for further detention those Enemy Combatants they determine are international terrorists or members of specified international terrorist organizations, pose a threat to the United States or US interests, and are of high operational or strategic intelligence or law enforcement value to the United States. Of those Enemy Combatants, Combatant Commander may only transfer to Guantanamo those whose exploitation requires the specialized capabilities available at Guantanamo.

(d) ~~(S)~~ When a Combatant Commander is conducting a non-war-on-terrorism mission and obtains control over a suspected Enemy Combatant who is an international terrorist, or a member of a specified international terrorist organization, as identified in references (E) or (G), poses a threat to the United States or US interests, and is of high operational or strategic intelligence or law enforcement value to the United States, he shall notify the Director of the Joint Staff by message and shall maintain control over this suspected Enemy Combatant until the Combatant Commander receives appropriate direction regarding the individual's ultimate disposition.

(f) (U) Reference (C) remains in effect. This document supersedes the *Implementing Guidance on Detainee Screening and Processing for Transfers of Detainees in Afghanistan, to Guantanamo Bay Naval Station*, Secretary of Defense, January 7, 2002 [rev. December 10, 2002], reference (D).

(g) ~~(FOUO)~~ The availability of DoD detention facilities at Guantanamo Bay, or elsewhere, shall not be a determining factor in whether a Combatant Commander detains or obtains control over an individual. The detainee facilities at Guantanamo Bay, Cuba, function as a strategic intelligence gathering center and should be used for detaining those Enemy Combatants who meet the stated criteria, and are of high operational or strategic intelligence or law enforcement value, and not those Low-level Enemy Combatants who pose only a tactical force protection threat. Nothing in this guidance authorizes (1) the commencement of military operations, or (2) the transfer to Guantanamo Bay, Cuba, of an Enemy Combatant. Actions regarding specific terrorists and/or terrorist organizations will be authorized in execute orders approved by the Secretary of Defense.

## IV. PROCEDURES

~~(S)~~ The following procedures shall be followed when a Combatant Commander obtains control of individuals in connection with Operation Enduring Freedom or other war-on-terrorism operations.

(a) ~~(S)~~ Screening: A Combatant Commander shall assess all individuals over whom he obtains control in connection with Operation Enduring Freedom or other war-on-terrorism operations to determine whether they are Enemy Combatants who are international terrorists or members of specified international terrorist organizations, pose a threat to the United States or US interests, and are of high operational or strategic intelligence or law enforcement value to the United States. A Combatant Commander shall request support from a Mobile Detainee Review and Screening Team (MDRST) (reference (C)), to conduct the screening. The detaining Combatant Commander shall collect and record to the maximum extent possible the following information about each Enemy Combatant under his control:

(b)(1),Sec. 1.4(a),Sec. 1.4(c)

(b)(1),Sec. 1.4(a),Sec. 1.4(c)

SECRET

(b)(1),Sec. 1.4(a),Sec. 1.4(c)

(b) (S) Requests for Screening Assistance by a Mobile Detainee Review and Screening Team (MDRST): The Combatant Commander shall request an MDRST review, or that an MDRST deploy to assist in, the screening process before recommending a detainee be sent to Guantanamo Bay or other detention facility. The MDRST will screen Enemy Combatants to determine whether they are international terrorists or members of specified international terrorist organizations identified in reference (E) and (G), pose a threat to the United States or US interests, and are of high operational or strategic intelligence or law enforcement value to the United States. The MDRST will advise the Combatant Commander whether an Enemy Combatant warrants transfer to, and detention at, Guantanamo Bay or at an alternative detention facility. In the event Commander, US Southern Command receives multiple requests for MDRST support, he shall prioritize the requests and, if unable to meet competing priorities, he shall notify the Director of the Joint Staff, who will establish priority of efforts among the Combatant Commanders.

(c) (S) Assignment of Internment Serial Numbers: When the Combatant Commander obtains control of an Enemy Combatant, he shall ensure that the relevant military police element assigns an Internment Serial Number (ISN) to the Enemy Combatant within five days or as soon as operationally practical. The purpose of the Internment Serial Number is to aid in maintaining accountability for detained persons. Once an Internment Serial Number is assigned, all further documentation and reporting will use only this number (no other numbering systems will be used).

(b)(1),Sec. 1.4(a)

The National Detainee Reporting Center shall issue separate blocks

SECRET

of Internment Serial Numbers to Combatant Commanders as required to support screening and detention operations.

(d) (S) Secretary of Defense Notification: The Combatant Commander shall notify the Secretary of Defense or his designee, and keep the Chairman of the Joint Chiefs of Staff informed, when:

- Recommending that an Enemy Combatant be transferred to Guantanamo Bay or other designated detention facility. Combatant Commanders shall include in the justification for the recommendation, the results of all screenings and the recommendation of the MDRST.
- Recommending against transferring a detained person (Enemy Combatant or other person) to Guantanamo Bay, or other designated detention facility, in cases where the MDRST recommends such transfer. Combatant Commanders shall include in the justification for the recommendation the results of all screenings and the recommendation of the MDRST.
- Obtaining control over any US citizen, or an individual claiming to have been born in or to be a national of, the United States, any citizen of a coalition partner nation, or a person whose transfer to a DoD detention facility is likely to raise significant policy concerns.
- An Enemy Combatant under DoD control will not be turned over to another U.S. government agency without authorization by the Secretary of Defense or his designee.
- Obtaining control over any individuals listed in references (B) or (C) and identified as international terrorists or members of an international terrorist organization, but not listed in the Execute Order approved by the Secretary of Defense for that operation.
- Identifying and obtaining control over any individual age 15 or younger. Transfer to Guantanamo of these individuals will proceed only upon a determination by the Secretary of Defense or his designee.

- Obtaining control over any individual, regardless of age, having a life-threatening health condition or mental health condition that would require immediate psychiatric care upon arrival at the detention location, if transferred.

- Deciding, after an initial screening, that the individual does not meet the criteria and recommending/deciding to release the individual (b)(1),Sec. 1.4(a)

- After review by the MDRST, agreeing with the MDRST that the individual does not meet the criteria and recommending/deciding to release the individual (b)(1),Sec. 1.4(a)

(e) (S) Temporary Holding In-Theater: The detaining Combatant Commander shall designate as appropriate and consistent with military necessity a temporary holding area in-theater to house Enemy Combatants.

(f) (U) Medical Screening: Before movement of any Enemy Combatant to Guantanamo Bay or other designated detention facility, the detaining Combatant Commander shall ensure that the Enemy Combatant has been medically screened for, among other things, life-threatening medical conditions and infectious diseases (including tuberculosis and HIV infection), or having a mental health condition that would require immediate psychiatric care upon arrival at the detention facility, if transferred, and is fit for transport. If the Enemy Combatant is fit for transport, a medical summary will be written and forwarded to the receiving facility prior to transfer. Additionally, if the detaining Combatant Commander is unable to determine accurately whether a detainee is age 15 or younger, he shall solicit assistance from the Armed Forces Institute of Pathology for this determination.[6] The following procedures apply:

- Requests for assistance from Combatant Commanders will be routed via the Joint Staff to the Office of the Armed Forces Medical Examiner - Armed Forces Institute of Pathology, Special Investigations Division, and will include the detainee's name/aliases and ISN.

---

[6] A review of radiological materials for age assessment will be made jointly by the Office of the Armed Forces Medical Examiner and the Musculoskeletal section of the Armed Forces Institute of Pathology.

SECRET

- Optimum records required for age estimation include a good quality anterior/posterior radiograph of the non-dominate hand (which will primarily be the left hand in most populations), and bitewing dental films picturing the second and third molars from one side of the jaw (maxillary and mandibular - one file each and should include molar root tips and surrounding alveolar bone).

- Film x-rays are preferred to digital, if possible. If digital radiographs are submitted, they are to be submitted on CD-ROM disk, including viewing program such as RVS (Rad info system), or in a Microsoft Windows compatible format.

(g) (S) Detainee Movement: The Secretary of Defense, or his designee, is the approval authority for the movement of all Enemy Combatants to Guantanamo Bay, or other designated detention facility, unless otherwise provided in applicable Execute Orders.

(b)(1),Sec. 1.4(a)

(h) (S) Detainee Assessment Team (DAT): The Assistant Secretary of Defense for Special Operations and Low-Intensity Conflict, and the Deputy General Counsel (International Affairs) will co-chair a DAT comprising representatives of the CJCS and other appropriate DoD officials to review those Enemy Combatants recommended by the detaining Combatant Commander for transport to Guantanamo. This team will help coordinate issues with other agencies as appropriate.

## V. DEFINITIONS

(a) (U) Enemy Combatant: Any person that US or allied forces could properly detain under the laws and customs of war. For purposes of the war on terrorism, an Enemy Combatant includes, but is not necessarily limited to, a member or agent of al Qaeda, the Taliban, or another international terrorist organization against which the United States is engaged in an armed conflict. This may include those individuals or entities designated in accordance with references (E) or (G), as identified in applicable Execute Orders approved by the Secretary of Defense.

(b) (U) International Terrorists and Specified International Terrorist Organizations, posing a threat to the United States or US interests: These groups will be identified in

the applicable Execute Orders approved by the Secretary of Defense. They include, but are not necessarily limited to, those individuals or entities designated in accordance with references (E) or (G).

(c) (S) Intelligence Value: An assessment that the individual has information of operational or strategic value related to terrorist activities or actions, which includes, but is not limited to:

(b)(1),Sec. 1.4(a)

(d) (U) Law Enforcement Value: An assessment that the individual possesses information relevant to a criminal investigation or is a possible target for prosecution for alleged criminal activity.

(e) (FOUO) Threat to the United States or US Interests: An individual poses a threat to the United States or US interests when there is reason to believe that such individual:

- is specifically listed in, or is a member of, a terrorist organization specified in the applicable Execute Order approved by the Secretary of Defense (this may also include, but is not limited to, those individuals or entities designated in accordance with references (E) or (G));

- has engaged in, aided, or conspired to commit, acts of international terrorism, or acts in preparation therefore, that have caused, threaten to cause, or have as their aim to cause, injury or adverse effects on the United States, its citizens, national security, foreign policy, or economy; or

- has knowingly harbored one or more of the above described individuals.

(f) (U) Screen: To obtain, corroborate as appropriate, and record to the maximum extent possible the information specified in paragraph IV(e) of this guidance.

(g) (U) Under DoD Control: When an individual is either in the physical control of DoD or, if in the physical control of another agency, has been designated by the President, or his designee, for transfer to DoD control.

(h) (U) DoD Detention Facility: As directed by the Secretary of Defense, or his designee, a facility to detain Enemy Combatants under DoD control in connection with Operation Enduring Freedom and other operations in the war on terrorism.

(i) (U) Low-level Enemy Combatant: Those individuals who are not a threat beyond the immediate battlefield or that do not have high operational or strategic intelligence or law enforcement value that requires the specialized type of exploitation capability available at Guantanamo.

VI. (U) These criteria and guidelines will be reviewed at least annually and updated and supplemented as necessary.

SECRET

8 August 03

**Detainee Screening in Afghanistan**

**I. REFERENCE**

(S) *Criteria and Guidelines for Screening and Processing Persons Detained by the Department of Defense in Connection with the War on Terrorism*, Secretary of Defense, __________, 2003.

**II. PURPOSE**

(a) Per direction of the Secretary of Defense, this document supercedes the *Implementing Guidance on Detainee Screening and Processing for Transfers of Detainees in Afghanistan, to Guantanamo Bay Naval Station*, Secretary of Defense, January 7, 2002 [rev. December 10, 2002].

(b) In connection with the reference above, this document provides supplemental guidance to Commander, US Central Command, regarding screening and processing individuals detained in Afghanistan in connection with the war on terrorism.

**III. PROCEDURES**

(a) (S) Commander, US Central Command should, as necessary, obtain control over the following Enemy Combatants:

(b)(1),Sec. 1.4(c)

(4) any others whom screeners suspect may pose a threat to US interests, may have strategic intelligence value, or may be of law enforcement interest.

(b) (S) Consistent with the reference above, Commander, US Central Command shall collect and record, to the maximum extent possible, detailed information about each Enemy Combatant under his control.

SECRET

Case 1:06-cv-01669-JDB Document 55-2-1 Filed 10/12/10 Page 21 of 45

SECRET

(c) (S) Commander, US Central Command will establish a Detainee Review and Screening Team (DRST) for Afghanistan, that will validate the information compiled on each individual for completeness and accuracy to the maximum extent possible. To the extent possible and appropriate, the team will include representatives of DoD (including CITF), (b)(1) SEC 1.4(c)(d) [redacted] to assist in evaluating and completing the information. In addition to ensuring all available information has been compiled as prescribed by the reference above, for each detainee, the team will determine the following:

(b)(1) [redacted]

(b)(1),Sec. 1.4(a),Sec. 1.4(c) [redacted]

(d) (S) The DRST shall screen these Enemy Combatants in accordance with the reference above. If the DRST in Afghanistan is unable to perform the required screening procedures, Commander, US Central Command shall follow the procedures outlined in the reference above for requesting additional assistance from a Mobile Detainee Review and Screening Team (MDRST).

(e) (S) Following review by the DRST (or MDRST, if needed), the Commander, US Central Command shall follow the procedures outlined in the reference above for holding and moving Enemy Combatants.

IV. DEFINITIONS

(b)(1),Sec. 1.4(b),Sec. 1.4(c) [redacted]

SECRET

# ATTACHMENT 2

**to Declaration of Tina M. Foster**
**(dated June 23, 2011)**

UNCLASSIFIED

# Proposed Revisions to Detainee Review Procedures in Afghanistan

## OUSD(P)/Office of Detainee Policy
## May 13, 2009

UNCLASSIFIED

~~UNCLASSIFIED~~

# Proposed Revisions to Detainee Review Procedures in Afghanistan

- **DoD is working to enhance the existing detainee review process, both substantively and procedurally**
- **Existing detainee review procedures (UECRBs) were established to support GTMO transfer decisions**
  - High-Level/Low-Level Enemy Combatant status determinations are tied to GTMO transfer criteria; but linkage between the BTIF and GTMO has been severed over time
- **Enhanced procedures will improve DoD's ability to assess:**
  - Whether each detainee meets the criteria for lawful detention
  - Level of threat the detainee poses
  - Detainee's potential for rehabilitation, reconciliation and reintegration
- **Proposed revisions also enhance the detainee's ability to challenge his or her detention**
- **Concurrently, DoD is working to transition BTIF operations to the TIFRC model used successfully in Iraq**
  - New BTIF to open in Fall of 2009
  - (b)(1),Sec. 1.4(a)
  - New detainee review procedures designed to facilitate this shift

~~UNCLASSIFIED~~

~~UNCLASSIFIED~~

# Overview of Proposed Changes

- **Substantive changes:**
  - Authority to detain mirrors definition in DOJ's March 13 habeas filing
  - (b)(1),Sec. 1.4(a)
  - Status determinations and threat assessments no longer tied to GTMO transfer criteria
  - Board makes final status determination (not just recommendation to the commander)
- **Procedural changes:**
  - Judge Advocates participate in capturing unit's initial, 72-hour review and BTIF commander's review of request to transfer detainee to BTIF for internment
  - Requirements of AR 190-8 serve as baseline for initial and periodic review boards, plus several features not required by AR 190-8:
    - Board follows written script to ensure detainee's meaningful participation
    - Open proceedings, except during deliberations/voting or for security reasons
    - Detainee allowed to call reasonably available witnesses and present relevant documentary evidence
    - Personal representative appointed to assist detainee (including during closed sessions)
    - Enhanced notification procedures, to ensure detainee fully understands the basis for his detention, the review process, and his role in the process
    - Judge Advocate serves as legal advisor to the board, as required
    - Judge Advocate conducts legal sufficiency review of board determinations

~~UNCLASSIFIED~~

UNCLASSIFIED

# Comparison of Detainee Process Models

| | Article 5 (AR 190-8) | UECRB (existing) | UECRB (proposed) |
|---|---|---|---|
| **Purpose** | To determine whether person is EPW | To recommend combatant status and disposition | To determine whether detainee meets criteria for internment and recommend disposition |
| **Nature** | Non-adversarial | Non-adversarial | Non-adversarial |
| **Standard** | Article 4, GPW | Unlawful Enemy Combatant | Detainable Person, as defined in March 13, 2009 DOJ filing |
| **Possible Findings** | EPW, RP, innocent civilian, CI | ❑ Status: HLEC, LLEC, NLEC<br>❑ Disposition: GTMO, continued detention at the BTIF, transfer, release w/o conditions | ❑ Status: does/does not meet criteria for internment, plus threat assessment<br>❑ Disposition: continued internment at the BTIF, transfer for prosecution or reconciliation, release w/o conditions |
| **Timing** | Not specified | Capturing unit review within 72 hours; transfer request within 14 days; initial board within 75 days; periodic boards every 6 months | Capturing unit review within 72 hours (w/ JAG); transfer request within 14 days (w/ JAG); initial board within 60 days; periodic reviews every 6 months |

UNCLASSIFIED

UNCLASSIFIED

# Comparison of Detainee Process Models (cont.)

| | Article 5 (AR 190-8) | UECRB (existing) | UECRB (proposed) |
|---|---|---|---|
| **Composition** | ❑ 3 officers, at least 1 field grade<br>❑ Senior officer is President<br>❑Non-voting recorder (preferably JAG) | ❑ 3 officers, at least 1 field grade<br>❑ Senior officer is President<br>❑Non-voting recorder | ❑ 3 field grade officers authorized access to all relevant information<br>❑ Senior officer is President<br>❑Non-voting recorder |
| **Legal Advisor** | No | No | Yes |
| **Personal Rep.** | No | No | Yes; authorized access to all relevant information |
| **Open/ Closed** | Open except for deliberation and voting, security; person whose status is to be determined allowed to attend open sessions | Closed; detainee allowed to appear at initial board | Open except for deliberation and voting, security; detainee allowed to attend open sessions |
| **Witnesses** | Yes, if reasonably available | No | Yes, if reasonably available |
| **Legal sufficiency review** | Yes | No | Yes |

UNCLASSIFIED

# ATTACHMENT 3

**to Declaration of Tina M. Foster**
**(dated June 23, 2011)**

~~SECRET~~

# DoD Policy Review of BTIF Procedures

- ☐ **OSD, OGC, Joint Staff, and CENTCOM are currently working to revise both substantive and procedural aspects of the BTIF review process**
- ☐ **Detainee review procedures at the BTIF (UECRBs) were originally established to support GTMO transfer decisions**
  - Review processes originated in 2002-2004 timeframe
  - High-level/Low-Level Enemy Combatant Status tied to GTMO transfer criteria
- ☐ **Linkage between the BTIF and GTMO severed over time**
- ☐ **DoD is working to transition current BTIF operations to the TIFRC model used successfully in Iraq**
  - New facility to open in October 2009
  - (b)(1),Sec. 1.4(a)
  - Requires reorientation of review and release processes to support this model

~~SECRET~~

based primarily on an assessment of whether continued detention by U.S. Forces is necessary to mitigate the threat the individual poses. The UECRB is the forum in which the Command reviews enemy combatant determinations and assesses whether continued detention by U.S. Forces is necessary.[3]

~~(S)~~ (b)(1),Sec. 1.4(a) In other words, (b)(1),Sec. 1.4(a)

(b)(1),Sec. 1.4(a)

~~(S)~~ This situation is likely the result of three key factors – space limitations at the BTIF, the limitations of the existing UECRB procedures, and staffing levels at the BTIF. (b)(1),Sec. 1.4(a) Increased capacity at the new BTIF will eliminate this factor when the facility opens in late 2009, but there is no feasible way to increase capacity at the existing BTIF, so a more immediate solution will be based on revisions to the UECRB procedures and/or increased staffing at the BTIF.

~~(S//NF)~~ The existing UECRB procedures satisfy applicable minimum legal requirements and comply with current DoD policy guidance. However, these

---

[3] (S//NF) The UECRB also assesses each detainee's intelligence value, but primarily for purposes of determining whether to classify the individual as a High-Level Enemy Combatant (HLEC) or Low-Level Enemy Combatant (LLEC). (b)(1),Sec. 1.4(a),Sec. 1.4(c)

(b)(1),Sec. 1.4(a),Sec. 1.4(b),Sec. 1.4(d)

procedures are less robust than the Combatant Status Review Tribunal (CSRT) procedures implemented at Guantanamo, the Multi-National Force Review Committee (MNFRC) procedures implemented in Iraq, and the Article 5 review procedures established by Geneva Convention III and incorporated in Army Regulation 190-8.[5] Key differences include the following: detainees may appear before the UECRB during an initial review conducted within 75 days of arrival at the BTIF, but not during periodic reviews conducted every six months thereafter; detainees may make a personal statement to the Board, but Board Members are not permitted to ask the detainees questions; detainees are not permitted to call witnesses; detainees are not afforded a personal representative to assist them during the proceedings; all proceedings are closed; the written record of the proceedings is not verbatim; there is no requirement for the Members to include a legal officer; and the convening authority is not a General Court-Martial Convening Authority or equivalent.

~~(S//NODIS)~~ After interviewing hundreds of BTIF detainees over the course of several years, [redacted]

(b)(3):10 Usc 130(c)

~~(S)~~ A more robust review process that incorporates some or all of the CSRT, MNFRC, and Article 5 procedures will make the UECRB a more effective tool. If revisions to the UECRB process improve the quality and timeliness of UECRB determinations, it will reduce the risk of transferring or releasing individuals whose threat the IRoA cannot adequately mitigate. It will also decrease the chances of detaining individuals who do not pose a threat or whose threat the IRoA could mitigate. This, in turn, [redacted] (b)(1),(b)(7)(A),(b)(7)(B),(b)(7)(D) Last, but certainly not least, it will enhance the credibility of our detention operations and detention review procedures.

---

[5] (S) Although the requirements of Geneva Convention III Relative to the Treatment of Prisoners of War do not, as a matter of law, apply to detainees at the BTIF, since they are held as enemy combatants rather than prisoners of war, this legal consideration does not preclude DoD from adopting Article 5 procedures in the UECRB context as a matter of policy.

~~SECRET~~

UNCLASSIFIED WHEN SEPARATED FROM CLASSIFIED ENCLOSURE

OFFICE OF THE UNDER SECRETARY OF DEFENSE
2000 DEFENSE PENTAGON
WASHINGTON, DC 20301-2000

POLICY

UNCLASSIFIED

JUL 14 2009

The Honorable Carl Levin
U.S. Senate
228 Russell Senate Office Building
Washington, D.C. 20510

Dear Chairman Levin:

[redacted]

(U) Please find enclosed a copy of the policy guidance that the Deputy Secretary of Defense approved on July 2, 2009, modifying the procedures for reviewing the status of aliens detained by the Department of Defense at the Bagram Theater Internment Facility (BTIF) in Afghanistan, and related policy guidance regarding the criteria for assessing the threat such aliens represent, and regarding the authority to transfer and release such aliens from the BTIF. The enhanced detainee review procedures significantly improve the Department of Defense's ability to assess whether the facts support the detention of each detainee as an unprivileged enemy belligerent, the level of threat the detainee represents, and the detainee's potential for rehabilitation and reconciliation. The modified procedures also enhance the detainee's ability to challenge his or her detention.

(U) The modified procedures adopt the definitional framework of detention authority that the Administration first published in a Guantanamo habeas filing on March 13, 2009. Under this framework, the Department of Defense has the authority to detain "[p]ersons who planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, and persons who harbored those responsible for those attacks." The Department of Defense also has the authority to detain "[p]ersons who were part of, or substantially supported, Taliban or al-Qaida forces or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act, or has directly supported hostilities, in aid of such enemy armed forces."

(U) In addition to assessing whether the facts support the detention of each detainee as an unprivileged enemy belligerent under this framework, the modified procedures require detainee review boards to consider each detainee's threat level and potential for rehabilitation and reconciliation. Moreover, these threat assessments will no longer be linked to the criteria for transferring the detainee to Guantanamo.

~~SECRET~~

UNCLASSIFIED WHEN SEPARATED FROM CLASSIFIED ENCLOSURE

Derived from: Multiple Sources
Declassify on: June 30, 2019

UNCLASSIFIED

2 of 6

extension of the Administration's modified definition of detention authority applicable at Guantanamo to detentions at the BTIF, and a formal delinking of detentions in Afghanistan from the past review policy focusing on onward transfers to the U.S. detention center at Guantanamo.

- (U) The modified definition included as part of a Guantanamo habeas filing on March 13, 2009 requires a showing that a person who "supported" Taliban or al-Qaida forces or associated forces did so "substantially."

- (U) Beyond the assessment of whether a detainee may be lawfully detained, the new procedures also require review boards to consider each detainee's threat level and potential for rehabilitation and reconciliation. Moreover, threat assessments will no longer be linked to the criteria for transfer to Guantanamo.

• (U) Procedurally, although the requirements of AR 190-8 serve as the baseline for the enhanced detainee review procedures, we have sought to add several features not found in AR 190-8 that further strengthen the ability of detainees to challenge their detention.

- (U) For example, the proceedings will be open to representatives of the ICRC, and possibly other non-governmental organizations, subject to military necessity and force protection criteria as determined by the internment facility commander, except for deliberations and voting or other matters that would compromise security. Detainees will be allowed to attend all open sessions and call reasonably available witnesses, all of which are provisions prescribed by AR 190-8 for Article 5 tribunals.

- (U) Additionally, a personal representative will be appointed to represent each detainee, which is not required for Article 5 tribunals but is the Department's practice for Combatant Status Review Tribunals at Guantanamo.

    ▪ (U) The personal representative will be required to act in the best interest of the detainee, and will be shielded from unlawful command influence and adverse personnel actions for his or her good faith efforts on behalf of the detainee.

- (U) A chart comparing the AR 190-8 requirements with the existing and proposed OEF detainee review procedures is attached at Tab F.

    ▪ (U) The end result is a process that approximates the process used to screen American citizens captured in Iraq.

# ATTACHMENT 4

**to Declaration of Tina M. Foster**
**(dated June 23, 2011)**

# DECLARATION OF AHMED IBRAHIM

1. I am over the age of 18 and competent to testify from personal knowledge as to the matters set forth in this Declaration. I make this Declaration at the request of United States counsel for Amanatullah Ali (1432) who is detained at Bagram. I am the cousin of Yunus Rahmatullah (ISN 1433), who is also detained at the US detention facility at Bagram, Afghanistan.

2. On March 11th 2011, Salah's father, Rahmatullah Khudabukhsh and I went to the ICRC's office in Karachi, Pakistan to speak to Salah over the telephone. This was the fourth time I spoke to Salah in a span of ten months. We spoke through a camera phone for one hour.

3. During the conversation Salah told us that two weeks earlier a lawyer came to meet him at Bagram and introduced herself as Tina Foster. During that meeting, Salah talked to her about his case. She told Salah that she is unable to do anything on his case as *Reprieve* is representing him. She also said that she would be back to see Salah in Bagram in one month's time.

4. On March 16th 2011, I called Sultana Noon who is a Fellow working for Reprieve in Islamabad, Pakistan. I have been in touch with her since March 2011 as Reprieve has been actively working on securing Salah's release both in Pakistan and the UK since then.

5. I told Sultana about my conversation with Salah and asked her if she knows Tina Foster. Sultana confirmed that Tina Foster is a lawyer based in the United States and represents prisoners at Bagram. Sultana was surprised when I told her that Salah met her in Bagram as she said that lawyers are not permitted to meet their clients in Bagram. I asked Sultana to please contact Tina Foster and ask her if she met Salah in Bagram.

6. A few hours later, I received a call from Sultana who said that she contacted Tina Foster via email and Tina confirmed that she has not met Salah and nor has she been to Bagram. Now Salah's father and I are very confused and upset. We do not understand who this woman was who posed as Tina Foster in front of Salah. We also want Salah to know that this person is an imposter and that he should not talk to her about his case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 16th 2011.

_______________________

Ahmed Ibrahim

# ATTACHMENT 5

**to Declaration of Tina M. Foster**
**(dated June 23, 2011)**

# DECLARATION OF HOUSSINE AL-NAJAR

I, Houssine Najar, hereby declare as follows, pursuant to 28 U.S.C. § 1746:

1) My name is Houssine Najar, and I am a citizen of Tunisia. I live in Geneva, Switzerland with my family.

2) I am the brother of Redha al-Najar, a citizen of Tunisia, who is currently imprisoned at the U.S. military base in Bagram, Afghanistan.

3) Prior to his abduction in May 2002, Redha lived in Karachi, Pakistan with his wife and young son.

4) I first learned that Redha was in U.S. military custody in 2003, when I received a letter from him through the International Committee of the Red Cross (ICRC). Since then, my family and I have sent and received many letters through the ICRC.

5) All of the letters that we have received from Redha have portions blacked-out so that not all parts of what Redha has written are visible. We have no idea why the U.S. government is holding Redha, or whether he will ever be released.

6) In December 2008, I authorized attorney Tina M. Foster of the International Justice Network to file a legal case in U.S. courts seeking his release.

7) Because the U.S. government would not allow Redha to communicate with an attorney, and knowing that he would want me to take legal action on his behalf to secure his release, I acted as Redha's "Next Friend" in filing his petition for a Writ of Habeas Corpus before this Court. Since filing the petition on Redha's behalf, I have stayed in touch with Ms. Foster periodically via an interpreter to receive periodic updates about his case.

8) In recent years, the U.S. military has permitted the ICRC to facilitate periodic telephone calls between Redha and I. I have informed Redha about the habeas case filed on his behalf before this Court, and he thanked me my efforts on his behalf.

9) During my last telephone call with Redha on or about May 27, 2011, he told me that the rules at Bagram had changed, and that attorneys are now allowed to visit with their clients in person at Bagram. Redha asked me to request that his attorney, Tina Foster, come to meet with him at Bagram as soon as possible. Redha also informed me that his file would next be reviewed by a military review board sometime in June 2011.

10) After speaking with Redha, I contacted Ms. Foster to let her know that Redha had requested that she visit him at Bagram as soon as possible. However, after speaking with Ms. Foster, I was very disappointed to learn that she is still unable to meet with Redha.

11) I am fluent in French, and have prepared this declaration with the assistance of a French-English interpreter.

Executed this 21 day of June, 2011 in Geneva, Switzerland.

[signature]

**Houssine Najar**

# ATTACHMENT 6

**to Declaration of Tina M. Foster**
**(dated June 23, 2011)**

**DECLARATION OF DAPHNE EVIATAR**

I, Daphne Eviatar, hereby declare as follows, pursuant to 28 U.S.C. § 1746:

1. I am currently the Senior Associate in the Law and Security Program at Human Rights First, a non-profit, nonpartisan human rights organization based in New York City and Washington, D.C. In this capacity, I investigate and report on U.S. national security policies and practices and their human rights implications.

2. I am an attorney licensed to practice in the State of New York. I received a J.D. from NYU Law School and a graduate degree in Journalism from Columbia University.

3. Both in my current position and in my former career as a journalist for ten years, I have conducted extensive research on U.S. detention operations in Afghanistan, focusing in particular on U.S. prison facilities at Bagram Air Base. The current detention facility, which opened in late 2009, is known as the Detention Facility at Parwan ("Parwan Facility").

4. Between February 3 and February 11, 2011, I traveled to Afghanistan to observe Detainee Review Board ("DRB") hearings at the invitation of the U.S. government. While in Afghanistan, I spoke with several U.S. military officials and members of the U.S. Department of State about the conditions at the Parwan Facility and the DRB process that takes place there. I also interviewed seven former Bagram detainees about their detention experiences in U.S. custody at Bagram. These interviews covered the conduct of the former detainees' DRB hearings, and the effectiveness and helpfulness of their personal representatives. A consultant retained by Human Rights First conducted at least six additional interviews of former Bagram detainees in late October and early November 2010.

5. The information in this declaration is based on my personal observations of DRBs, my discussions with U.S. officials, the accounts of DRB proceedings that I received directly from former detainees, and my review of the detailed interview notes prepared by Human Rights First's consultant.

6. While visiting the Parwan Facility, I observed an Afghan criminal trial of a Bagram detainee. The trial was held at the Parwan Facility, but the judge, lawyers, and other officials involved in the proceeding were all Afghan. U.S. officials told me that 52 Afghan criminal trials had taken place at Bagram, resulting in 50 convictions.

7. According to U.S. government officials, the United States was detaining approximately 1,550 individuals at the DFIP at the time of my visit. This is a very significant increase from historical levels. Before 2009, the detainee population at Bagram numbered approximately 600 detainees. William Lietzau, Deputy Assistant Secretary of Defense for Detainee Affairs at the Office of Detainee Policy, in June said that the number has increased to approximately 2000 detainees at the DFIP.

8. At the Parwan Facility, I observed DRB hearings in the cases of four Bagram detainees. DRB hearings comprise two parts: an open session at which the detainee is permitted to attend and a closed session during which classified information is presented outside of the detainee's presence. I was only permitted to observe open sessions.

9. Each detainee at Bagram is assigned a personal representative. According to U.S. military officials at Bagram, there are a total of 15 personal representatives available to represent all Bagram detainees. Personal representatives are not lawyers.

10. Based on my personal observations, it is apparent that personal representatives are not able to provide detainees with the type of assistance that could be offered by competent legal counsel.

11. Personal representatives introduced little or no evidence in the DRBs that I observed. They posed few questions, and the questions they did ask were not probing. In general, personal representatives did not play a significant role in the DRB proceedings. A competent lawyer would have been able to advocate much more effectively on behalf of a detainee.

12. According to the former Bagram detainees I interviewed, personal representatives were of little help to detainees. The personal representatives assigned to these detainees did not gather factual evidence tending to prove a detainee's innocence. At best, personal representatives were able to arrange for family members and village elders to appear at a detainee's DRB hearing as character witnesses.

13. In fact, several former detainees told me that they did not feel comfortable confiding in their personal representative at all.

14. A significant portion of each DRB hearing is conducted in closed session, from which the detainee is excluded. Classified evidence is introduced during these closed sessions.

15. It appears that there is little or no effort to minimize the amount of evidence that is withheld from the detainee in the DRB hearing, whether by declassifying documents, providing redacted versions of partially-classified documents, providing unclassified summaries of classified information, or by other means.

16. I spoke with a military official responsible for declassifying and redacting documents for use in legal proceedings at Bagram, including both DRB hearings and Afghan criminal trials. He told me that his work consisted almost exclusively of redacting documents for

use in Afghan criminal trials of Bagram detainees. He also told me that documents to be used in DRB hearings are rarely, if ever, redacted, and are even more rarely declassified. Apart from an initial cursory summary for detainees setting out the basis for their detention, it does not appear that the military ever prepares unclassified summaries of classified evidence for use in DRB hearings.

17. Military officials at Bagram confirmed to me that the DRB panel is only empowered to make recommendations about the disposition of a detainee's case. The DRB does not have authority to order detainees released, or to insist on any other disposition.

18. The actual decision as to whether a detainee will be released, will be transferred to Afghan custody or to a third country, or will remain in U.S. custody is not made by the DRB. Instead, this decision is made by the Commander of the Parwan Facility or his designee – officials who do not participate in the DRB hearing. There do not appear to be any standards guiding or limiting the determinations of the Commander or his designee.

19. In addition to recommending a disposition in each detainee's case, DRBs make a recommendation as to whether a detainee is an "Enduring Security Threat." The criteria for designating an individual as an "Enduring Security Threat" appear to be classified. The consequences of this designation are unclear, although it appears that detainees give this designation are much less likely to be released or transferred out of U.S. custody.

20. Based on statements made to me by U.S. officials, it appears that several non-Afghan detainees have been recommended for release from U.S. custody but nevertheless remain in U.S. custody for months after release has been approved. In at least one instance, I was informed that a non-Afghan detainee's release determination was rescinded in a subsequent DRB hearing, which took place because he had not been released for six months after the first DRB

hearing recommending release. U.S. officials stated that the release determination in that case was rescinded despite the absence of new evidence against the detainee. U.S. officials also stated that non-Afghan detainees approved for released remain in custody due to holds placed by officials in Washington, D.C.

21. In papers recently filed in the above-captioned cases, attorneys for the U.S. government refer to an article I wrote that was in the Huffington Post on Feb. 13, 2011.

22. A copy of the article, *Justice Remains Elusive for Many at U.S. Prison in Afghanistan*, is available at http://www.huffingtonpost.com/daphne-eviatar/justice-remains-elusive-f_b_822669.html, and is attached hereto as "Exhibit A".

23. In that article, I described the case of Hamidullah Khan, a 16-year-old Pakistani boy who was captured by the U.S. military in 2008 and has been detained at Bagram ever since.

24. In the very first paragraph of my article, I included a link to the press release issued by Hamidullah's attorneys that explains the basis for my ultimate conclusion -- that detainees (like Hamidullah) may remain at Bagram despite having been cleared for release from custody by the U.S. government's own review procedures.

25. In their brief, Respondents argue that my conclusion that detainees may remain at Bagram after having been cleared for release is incorrect. However, they do not address the status of the case referred to in my article, (which included citations to the press release concerning Hamidullah Khan's cleared status).

26. Instead, attorneys for the government make the unsupported allegation in their brief that that I have somehow confused Hamidullah's case with that of another Bagram detainee, Jan Sher Khan. This is incorrect.

27. Moreover, there is no basis for the unsubstantiated conclusion of the government's attorneys that I was "confused", given that Jan Sher Khan's case is not mentioned anywhere in my article or the links cited in it.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed this 21st day of June, 2011.

Daphne Eviatar/KAF
Daphne Eviatar